In re **ADVISORY OPINION TO THE GOVERNOR (Rhode Island Ethics Commission—Separation of Powers).**

No. 97–572–M.P.

Supreme Court of Rhode Island.

June 29, 1999.

Anthony F. Cottone—A.C.L.U., Princeton, Joseph S. Larisa, Jr., Harris Weiner—Governor Almond, Providence, for plaintiff.

Joseph V. Cavanagh, Jr., Karen A. Pelczarski (Common Cause), Providence, Daniel A. Curran, James P. Marusak (En-

vironment Council of Rhode Island), Providence, Jay S. Goodman (General Assembly), Providence, Jeffrey B. Bile, Thomas Dickinson (Attorney General), Providence, Patrick T. Conley, Edward M. Fogarty (Senate), Providence, Robert Senville (Operation Clean Government), Rumford, John Tarantino (Rhode Island Bar Association), Providence, Lauren E. Jones (Rhode Island House of Representatives), Providence, Amelia E. Edwards (Rhode Island Ethics Commission), Providence, Brian Bishop, for defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, GOLDBERG and FLANDERS, JJ.

To His Excellency Lincoln C. Almond, Governor of the State of Rhode Island and Providence Plantations:

We have received from Your Excellency a letter dated November 20, 1997, wherein you have propounded to us pursuant to article 10, section 3, of the Rhode Island Constitution your request for our written opinion on the following questions:

"1) Does Article III, section 8 of the Rhode Island Constitution, which empowers the Rhode Island Ethics Commission to 'adopt a code of ethics, including, but not limited to provisions on conflicts of interest, * * * [and] use of position' provide the Ethics Commission with the power to adopt Regulation 36-14-5014?

"2) Is the principle of separation of powers contained in the Rhode Island Constitution properly interpreted in the same fashion as it has been interpreted in the United States Constitution with respect to appointments, such that neither legislators, nor their appointees, may serve on any public body within the executive branch of state government, or state executive, public and quasi-public boards, authorities, corporations, commissions, councils or agencies except those which: (i) function solely in an advisory capacity; or (ii) exercise solely legislative functions?

"3) Does the separation of powers principle contained in the Rhode Island Constitution impose any limits whatsoever on legislative appointments to a public board or body (as defined above)? In particular, does the Constitution prohibit legislators and/or their appointees from constituting a majority of the membership of a public board or body? Does the Constitution prohibit appointment of sitting legislators to a public board or body?"

The questions propounded by Your Excellency stem from the approval of Regulation 36-14-5014 (Regulation 5014) by the Rhode Island Ethics Commission (ethics commission or commission). Regulation 5014 provides:

"Prohibited Activities—Members of the General Assembly—Restrictions on activities relating to Public Boards.

"(1) No member of the General Assembly shall serve as a member of a Public Board. No member of the General Assembly shall participate in the appointment, except through advice and consent as provided by law, of any other person to serve as a member of a Public Board.

"(2) For purposes of this regulation, 'Public Board' means all public bodies within the executive branch of state government, and all state executive, public and quasi-public boards, authorities, corporations, commissions, councils or agencies; provided, however, that the foregoing definition shall not apply to any such entity which (i) functions solely in an advisory capacity, or (ii) exercises solely legislative functions.

"(3) The effective date of this regulation is July 1, 1999."

## Procedural Background

In November 1986, the voters of this state approved an amendment to the Rhode Island Constitution to include an independent, non-partisan ethics commission to oversee ethics in state and local government. The amendment was subse-

quently incorporated into the Rhode Island Constitution as article 3, sections 7 and 8, which read as follows:

"Section 7. Ethical conduct.—The people of the State of Rhode Island believe that public officials and employees must adhere to the highest standards of ethical conduct, respect the public trust and the rights of all persons, be open, accountable and responsive, avoid the appearance of impropriety and not use their position for private gain or advantage. Such persons shall hold their positions during good behavior.

"Section 8. Ethics commission—Code of ethics.—The [G]eneral [A]ssembly shall establish an independent nonpartisan ethics commission which shall adopt a code of ethics including, but not limited to, provisions on conflicts of interest, confidential information, use of position, contracts with government agencies and financial disclosure. All elected and appointed officials and employees of state and local government, of boards, commissions and agencies shall be subject to the code of ethics. The ethics commission shall have the authority to investigate violations of the code of ethics and to impose penalties, as provided by law; and the commission shall have the power to remove from office officials who are not subject to impeachment."

We observe that section 7 casts light upon the scope of the authority and duties of the ethics commission by setting forth the expectations of the people of this state concerning the standards of ethical conduct that should guide and inform the actions of public officials. Moreover, section 7 tracks closely the meanings of the terms "ethic" and "ethics" as defined in Webster's Third New International Dictionary 780 (3d unabr. ed.1976):

"1. the discipline dealing with what is good and bad or right and wrong or with moral duty and obligation * * * 2a:a group of moral principles or set of values * * * (c) * * *: the principles of conduct governing an individual or a profession: standards of behavior."

The pertinent part of section 8 in respect to our analysis of Regulation 5014 is the mandate that the "[G]eneral [A]ssembly shall establish an independent non-partisan ethics commission which shall adopt a code of ethics including, but not limited to, provisions on conflicts of interest, confidential information, use of position, contracts with government agencies and financial disclosure." R.I. Const. art. 3, sec. 8. *See generally In re Advisory Opinion to the Governor (Ethics Commission)*, 612 A.2d 1, 2–5 (R.I.1992) (detailing the history of the ethics commission).

On October 10, 1995, envisioning that its authority to promulgate "provisions on conflicts of interest" enabled it to adopt Regulation 5014, the ethics commission voted to issue the proposed draft code of ethics for public comment. The draft included proposed regulation 5.13A (later renumbered Regulation 5014). After a series of public hearings required by the Code of Ethics, G.L.1956 § 36–14–9(3), and the Administrative Procedures Act, G.L.1956 § 42–35–3, the ethics commission adopted the proposed code in May 1997, with an effective date of July 1, 1999.

Prior to its approval of Regulation 5014, the ethics commission sought the advice and opinion of its own executive director regarding the regulation's constitutional validity. The executive director, we are informed, advised the commission that the regulation appeared to be unconstitutional. The commission's legal counsel, we are also informed, declined to provide the commission with a legal opinion on Regulation 5014. Thereafter, the commission sought the advice of Professor Geoffrey C. Hazard (Professor Hazard) of the University of Pennsylvania, a nationally renowned scholar and authority in the field of ethics in government and ethics legislation. Professor Hazard agreed with the ethics commission's executive director and advised the commission that the regulation was of questionable constitutionality and that it

"exceed[ed] the authority conferred on the Commission by the Rhode Island Constitution." Despite Professor Hazard's legal opinion and in the absence of any express indication that the regulation was in fact constitutional, the ethics commission nonetheless proceeded unanimously to adopt Regulation 5014.

In essence, the regulation prohibits any member of the General Assembly not only from serving as a member of any governmental public board or commission, but also bars the members of the Legislature from participating in the appointment process to those entities, except through advice and consent as provided by law.[1] The effective date of the regulation was delayed until July 1, 1999, in order for the commission to request through Your Excellency an advisory opinion from this Court. At the commission's urging, Your Excellency via letter dated November 20, 1997, requested that this Court give its advisory opinion on the constitutionality of Regulation 5014 pursuant to the Rhode Island Constitution, article 10, section 3, which allows the governor to request advisory opinions. In response, this Court issued a November 26, 1997 order requesting briefs from proponents and opponents of the regulation. Thirteen briefs were filed by interested parties. The Court heard oral argument on November 10, 1998. We now address these questions.

### Propriety of the Request

■ Pursuant to article 10, section 3, of our State Constitution, this Court is required to give its written opinion upon any question of law whenever requested to do so by the Governor or by either chamber of the General Assembly. We have previously interpreted that constitutional mandate as requiring our response to your Excellency's request only "when the question or questions propounded 'concern the constitutionality of *existing* statutes which require implementation by the Chief Exec-

utive,' " *In re Advisory from the Governor*, 633 A.2d 664, 666 (R.I.1993) (emphasis added), and have a bearing upon a present constitutional duty awaiting performance by the Chief Executive. *In re Request for Advisory Opinion Regarding House Bill 83-H-5640*, 472 A.2d 301, 302 (R.I.1984).

At the time of your request, and indeed at the present time, Regulation 5014 has not become effective and thus does not concern any constitutional duty presently awaiting performance by Your Excellency. Accordingly, and consistent with the long established precedent of this Court, we would ordinarily refrain from responding to Your Excellency's request and instead direct the commission to its readily available means of adjudicating the validity of the regulation in the Superior Court pursuant to the Uniform Declaratory Judgments Act, G.L.1956 chapter 30 of title 9. *In re Advisory Opinion to the Governor*, 483 A.2d 1078, 1079 (R.I.1984); *see also In re Advisory from the Governor*, 633 A.2d at 666; *In re Advisory Opinion (Chief Justice)*, 507 A.2d 1316, 1319 (R.I.1986); *Advisory Opinion to the Governor*, 110 R.I. 1, 5, 289 A.2d 430, 433 (1972).

However, the question of whether Regulation 5014 falls within the ambit of the powers delegated by article 3, sections 7 and 8 of our Constitution, to the commission is a significant constitutional issue of great public interest sufficient to transcend these infirmities. Therefore, in deference to your Excellency's concern, we proceed to respond to your inquiry notwithstanding the significant procedural deficiencies. *In re Advisory from the Governor*, 633 A.2d at 667.

### 1986 State Constitution and Regulation 5014

Article 3, section 8, of the Rhode Island Constitution adopted by the electorate on November 4, 1986, made provision for the establishment of "an independent non-partisan ethics commission." The section au-

---

**1.** Excepted from that global prohibition would be entities that function solely in an advisory capacity or that exercise exclusively legislative functions.

thorized the commission to promulgate and adopt a code of ethics prescribing standards of conduct expected of all elected and appointed officers and employees who serve on boards, commissions, and agencies in both state and local government. *Id.* The constitutional mandate was later implemented by an act of the General Assembly in 1987, P.L.1987, ch. 195 (G.L.1956 chapter 14 of title 36), which created and made operational the Rhode Island Ethics Commission.

 Article 3, sections 7 and 8, of the 1986 Constitution have delegated to the commission clear authority to adopt a code of ethics establishing substantive standards of ethical conduct that would be expected and required of all who, as elected or appointed officers and employees, are responsible for governmental functions at the state and local levels. Indeed, we have previously noted the existence of that authority in the commission. *In re Advisory Opinion to the Governor*, 612 A.2d at 13. That authority, however, does not include unbounded power, without limitation. The primary intent of article 3, sections 7 and 8, is to vest in the ethics commission the "authority to develop a code of ethics, to investigate violations, and to enforce its provisions, always subject to review by the judicial branch of government consistent with the Constitution." 612 A.2d at 10–11. Article 3, sections 7 and 8, most assuredly did not create or establish any "fourth branch" of state government, but merely served to transfer to the commission a limited portion of what had always been a legislative prerogative, namely, the enactment of substantive ethics regulations. The 1986 Constitution continued to reserve to the General Assembly a concurrent authority to enact substantive legislation on codes of ethical conduct. 612 A.2d at 14. That concurrent authority restricts the Legislature only from "enacting laws that [would be] inconsistent with, or contradictory, to [any] code of ethics adopted by the commission." *Id.*

 As an administrative agency, the ethics commission is bound by the acts that empower it. *Clarke v. Morsilli*, 714 A.2d 597, 600 (R.I.1998). Although appellate courts frequently accord agency decisions varying levels of deference, the questions before us do not result from a dispute over a set of facts as ascertained by the commission, nor from a dispute concerning an act within the commission's "administrative discretion." Instead, we are faced here with a·question of law, namely, whether the ethics commission possesses the requisite authority to promulgate Regulation 5014. As such, we review this legal question *de novo* without deference to the agency's interpretation. *See City of East Providence v. Public Utilities Commission*, 566 A.2d 1305, 1307 (R.I.1989) (holding that factual findings of an agency are typically shown great deference, but a dispute involving statutory interpretation is a question of law requiring *de novo* review); Stephen G. Breyer, *Judicial review of questions of law and policy*, 38 Admin. L.Rev. 363, 371 (1986). *See also Rowse v. Platte Valley Livestock, Inc.*, 597 F.Supp. 1055, 1057 (D.Neb.1984) (jurisdiction of an agency is a question of law subject to *de novo* review).

 Moreover, when an agency construes its own enabling act, it is subject to increased scrutiny inasmuch as "government agencies have a tendency to swell, not shrink, and are likely to have an expansive view of their mission." *Hi–Craft Clothing Co. v. National Labor Relations Board*, 660 F.2d 910, 916 (3d Cir.1981). And while the commission may promulgate regulations that do not exceed its delegated authority, this Court "sits as 'final arbiter of the validity or interpretation of statutory law,' *as well as of any agency regulations promulgated to administer that law.*" *Clarke*, 714 A.2d at 600. (Emphasis added.) *See also Lerner v. Gill*, 463 A.2d 1352, 1358 (R.I.1983) ("If the lawmaking branch has not conferred such authority upon the agency promulgating the rule, the promulgation is interpretive

and is not to be considered controlling by the courts."). Given these parameters, we proceed to examine *de novo* whether the ethics commission exceeded its authority by promulgating Regulation 5014.

### Purpose and Scope of Regulation 5014

■ The ethics commission assumed and advocated in its brief to this Court that the "framers" of the 1986 State Constitution intended to "empower" the commission to adopt regulations to prevent abuses and misuses of public office and "to target the abuses when legislators serve on or appoint members" to governmental public boards, commissions, or agencies. The commission further asserted that all such boards, commissions, and agencies are in reality executive agencies, excepting those that function solely in an advisory capacity or exercise legislative functions exclusively, and that appointments thereto can be made only by the Governor as chief executive.

We should first note that if Regulation 5014 is valid, it would have the unexpected consequence of declaring the membership of the ethics commission itself illegal and violative of the proposed regulation. It is undisputed that the ethics commission consists of nine members. Four of these members are appointed by the Governor without participation by any other body, and five of the members are appointed by the Governor from lists submitted by the leadership of the General Assembly. Section 36–14–8(a). In *In re Advisory Opinion to the Governor*, 612 A.2d at 17, we deemed this method of appointment salutary as well as valid:

"The sharing of appointment responsibilities over a majority of members ensures fair consideration and independence should the commission be called upon to investigate officials responsible for their appointment."

In making this observation, we cited the case of *Parcell v. State*, 228 Kan. 794, 620 P.2d 834 (1980), in which the Supreme Court of Kansas approved the appointment of members of an ethics commission, consisting of eleven members, of which five were appointed by the governor, and the remainder were appointed by the Legislature. The Kansas Supreme Court recognized that the doctrine of separation of powers admits to some extent the blend of powers and concluded that the appointment of the majority of the commission members by the Legislature did not usurp the executive power of appointment. *Id.* at 837. This opinion by the Kansas Supreme Court assumed that the doctrine of separation of powers generally existed in that jurisdiction.

It appears somewhat paradoxical that the ethics commission's regulation prohibiting the service by members of the General Assembly upon a public board and prohibiting General Assembly participation in the appointment except through advice and consent would, wittingly or not, subject its own status to immediate challenge as invalidly composed.

Our colleague, who writes separately, suggests that the ethics commission would not fit within the definition of an executive board or agency. With this assertion we must vigorously disagree. It is the function of the commission to receive and investigate complaints. If probable cause is found, the commission through its executive director will prosecute the complaint before members of the commission. This function is clearly executive and is remarkably similar to the functions performed by the Attorney General or public prosecutors in other states who would clearly fall within the executive branch. The commission then adjudicates the complaint and thus performs a judicial function, though subject to review by the courts. Therefore, the ethics commission combines the functions of a legislative body in adopting and promulgating an ethical code, of an executive body in prosecuting violations of the code, and of a judicial body in adjudicating alleged violations. If our colleague's suggestion were to be accepted and Regulation 5014 were ap-

proved, the ethics commission would also sit as a continuing constitutional convention in which capacity it would have the power to alter the structure of government to comport with its views in respect to the type of governmental structure least likely to give rise to ethical problems. We are of the opinion that the people of this state in adopting the 1986 Constitution had no intention of creating a body so limitless in its power as to constitute a paramount fourth branch of government.

Moreover, Regulation 5014, if authorized by our Constitution, would invalidate scores of other boards and commissions that currently exist and perform a number of important and sometimes vital functions. The number of public boards whose composition would be invalidated by this regulation cannot be precisely ascertained, but the briefs filed by certain *amici* estimate the number as ranging from 65 to 140. *See post.* This regulation, then, would have a sweeping effect and would create a wall of separation high and impenetrable between the appointment power of the Executive and the power of the Legislature. Could such a wall be justified by our case law and constitutional history, especially given that the 1986 State Constitution delegated to the commission only specific, limited ethics authority, taken from the otherwise vast panoply of rights and powers that for centuries has been vouchsafed in the General Assembly? Indeed, article 6, section 10, of the 1986 Constitution specifically reaffirms the General Assembly's unfettered right and power to "continue to exercise the powers it has heretofore exercised, unless prohibited in this Constitution." *See also Kass v. Retirement Board of the Employees' Retirement System of the State of Rhode Island,* 567 A.2d 358, 361 (R.I.1989).

In *Kass,* we began our analysis "by reenunciating a principle expounded by Justice Oliver Wendell Holmes in *New York Trust Co. v. Eisner,* 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963, 983 (1921), '[A] page of history is worth a volume of logic' in determining the extent of state as well as federal constitutional limitations." *Kass,* 567 A.2d at 360. We went on to address the historic power of the Rhode Island General Assembly:

"Historically, the power of the General Assembly in this state, as in other states, has been plenary and unlimited, save as this authority may have been limited by the Constitution of the United States and the Constitution of the State of Rhode Island. *In re Advisory Opinion to the House of Representatives,* 485 A.2d at 553; *Opinion to the Governor,* 101 R.I. 203, 206, 221 A.2d 799, 801 (1966); *Payne & Butler v. Providence Gas Co.,* 31 R.I. 295, 315, 77 A. 145, 153 (1910). It has been set forth in *Payne & Butler v. Providence Gas Co., supra,* that from the granting of the charter of King Charles II, July 8, 1663, to the date of the acknowledgment of our independence by the British Crown, the Rhode Island Legislature possessed the complete powers conferred by the royal charter and thereafter from the time of independence the Legislature had the combined powers of crown and Parliament, which included all attributes of sovereign authority. *Id.* After May 29, 1790, when this state in convention ratified the Federal Constitution, those powers were limited by that Constitution. Thereafter, until May 1843, the Legislature retained all residual powers of sovereignty, save those delegated to the federal government. *Id.* at 315, 77 A. at 153–54. In 1843 these powers were again diminished by limitations set forth in our State Constitution.

"Unlike the United States Congress, the Rhode Island General Assembly does not look to our State Constitution for grants of power. *In re Advisory Opinion to the House of Representatives,* 485 A.2d at 553; *Payne & Butler,* 31 R.I. at 316, 77 A. at 154. Accordingly, this court has consistently adhered to the view that the General Assembly possessed 'all of the powers inhering in

sovereignty other than those which the constitution textually commits to the other branches of our state government and that those that are not so committed * * * are powers reserved to the general assembly.' *Nugent v. City of East Providence*, 103 R.I. 518, 525–26, 238 A.2d 758, 762 (1968). ·

"The 1986 electorate reaffirmed the plenary legislative power of the Rhode Island General Assembly, as encapsulated in art. VI, sec. 10:

'The general assembly shall continue to exercise the powers it has heretofore exercised, unless prohibited in *this* Constitution.' (Emphasis added.)

"This provision must be construed to constitute a reaffirmation of the powers historically exercised by the Legislature under the prior constitution." *Kass*, 567 A.2d at 360–61.

In recognition of the centuries-old historic and constitutional origins of the General Assembly's recognized authority to make appointments—authority that Regulation 5014 now seeks to remove from the General Assembly and relocate exclusively in the executive department of our state government—we begin with a brief summary of the structure of early government of Rhode Island.[2] The royal charter obtained from Charles II of England by Dr. John Clarke of Newport in 1663 delegated virtually unlimited power to govern to the General Assembly. A portion of that power was often utilized by the General Assembly to appoint persons, including from its own membership, to various *ad hoc* committees to address colonial administrative governmental functions and needs.

For 170 years under the charter government, the governor, deputy governor, and ten assistants, were engaged in legislative affairs as the Upper House of the General Assembly, while the deputies from the various towns constituted the Lower House. Charter of King Charles II (July 8, 1663) *reprinted in* Rhode Island Manual 108 (1994). These officials also engaged in judicial affairs as the Superior Court of Judicature. *Id.;* Chief Justice Edmund W. Flynn, *Judicial History in Rhode Island, in* 1 West's Rhode Island Digest XV–XVI (1952). The governor was a member of the Legislature and served in a limited executive capacity, whereas the General Assembly exercised legislative power, judicial power, and unlimited power of appointment. In its legislative capacity, the General Assembly was immune even from veto power by the governor, and more important, the Crown retained no discretionary power to repeal laws made in this colony. Records of the Colony of Rhode Island and Providence Plantations in New England, vol. IV, 461 (John Russell Bartlett ed. 1859). So long as the laws were not contrary to, but were "agreeable" to the laws of England, the General Assembly's power was untrammeled: "In this charter, no negative voice is given to the Governor, nor any power reserved to the crown of approving or disapproving the laws to be made in this colony." *Id.*

In 1841 when our first state Constitution was proposed and drafted, its convention members elected to continue to vest in the now constitution-based General Assembly all of the powers it had exercised to that point, unless prohibited by the Constitu-

2. We gratefully acknowledge the assistance provided by the discussion of these historical and constitutional origins and of the issues before us in the thousand-plus pages of eloquent and scholarly briefs that have been filed in the course of this proceeding by the parties and amici. Briefs were submitted by the Governor and the Ethics Commission, and by *amici curiae.* including the Rhode Island House of Representatives, the Rhode Island Senate, the immediate past and the current Attorneys General, American Civil Liberties Union of Rhode Island, Common Cause of Rhode Island, Environment Council of Rhode Island, League of Women Voters of Rhode Island, Operation Clean Government, Red Alert, Inc., Rhode Island State Council of Churches, Rhode Island Wiseuse, and Attorneys Patrick T. Conley, Daniel Curran, and Jay Goodman. One such filing, for example, from an amicus consisted of 168 pages of historical review prefaced by another 20 separate pages of historical bibliography, legal references, and secondary sources.

tion. R.I. Const. art. 6, sec. 10. This Court later assessed those powers to be not simply the authority of the "English crown" emanating from the 1663 royal charter, "but of both crown and parliament, except so far as it has been limited by the Constitution of the State, or by the Constitution and laws of the United States." *Clarke v. City of Providence,* 16 R.I. 337, 341, 15 A. 763, 765 (1888).

We particularly note that the drafters of our first state Constitution opted not to include in the proposed 1842 Constitution any provision such as that found in Article I, section 6, of the Federal Constitution prohibiting dual office holding or some of the appointments contemplated by Regulation 5014. Instead, the 1842 convention delegates chose to recommend what would be later ratified as article 9, section 6, of the Constitution, a section that did not prohibit dual office holding. *Cf. Gorham v. Robinson,* 57 R.I. 1, 15–16, 186 A. 832, 841 (1936) (Landholders Constitution rejected rigid separation of powers formulation).

Although the complete commingling of governmental duties was significantly modified after the May 1843 effective date of the Constitution and by the case of *G. & D. Taylor & Co. v. Place,* 4 R.I. 324 (1856), the Legislature continued to exercise substantial executive functions by electing all judicial officers as well as many officers who might be considered part of the executive branch. Moreover, legislative appointment of executive-type boards has been a long-standing practice in this state even under the first Constitution as early as 1844, when the Legislature appointed all members of the board of railroad commissioners as well as virtually all other state officers. P.L. 1844, § 6 at 339. Thus, Rhode Island's history is that of a quintessential system of parliamentary supremacy.

The parliamentary system of government obtains throughout much of the continent of Europe and in over fifty countries throughout the world. In Great Britain,

for example, the Prime Minister (the equivalent of our executive), who is a member of Parliament and plays a leading role in parliamentary proceedings, must be approved by the House of Commons (the Legislature) and may be forced to resign at any time by a vote of no confidence by the Commons. Sydney D. Bailey, *British Parliamentary Democracy* 8, 22–23 (2d ed.1964). Governmental power is placed in the hands of members of the cabinet (executive officers) who are nominated by the Prime Minister from among the members of the House of Commons and House of Lords. William A. Robson, *The British System of Government* 21–22 (1940). Acting on the advice of the Prime Minister and the Lord Chancellor, the Queen appoints all High Court judges. The Lord Chancellor serves as head of the Judiciary as well as The Speaker of The House of Lords. L.W. White & W.D. Hussey, *Government in Great Britain, The Empire and the Commonwealth* 128–29 (1958); Bailey, at 170. The highest court in Great Britain is the High Court of Parliament which exercises its power through The House of Lords. White & Hussey, at 133.

While this system is completely different from the structure adopted by the framers of our federal Constitution, such statesmen as William Gladstone, Benjamin Disraeli, and Winston Churchill would have been horrified at the suggestion that the British government was structurally unethical. The question of the structure of the government is not an ethical question, but a constitutional one.

It has been suggested that the people of Rhode Island rebelled from a parliamentary system at the time of the Revolution. Nothing could be further from historical fact. Rhode Island not only did not rebel from a parliamentary system, it retained the charter which created such a system from 1776 until 1843, a period of sixty-seven years. The parliamentary system was modified in 1843 so that ultimately the judicial power was declared separate in the famous case of *G. & D. Taylor &*

*Co. v. Place*, 4 R.I. 324 (1856). In that opinion, in which Chief Justice Ames declared the judicial power to be independent from interference by the General Assembly, he stated: "[t]he executive power had been nominal, merely, under the charter; and the constitution extends it very little." *Id.* at 349–50. It is notable that the Constitution of 1843, just as did the Constitution of 1986 by specific provision, authorized the General Assembly to continue exercising the powers that to that time were exercised under the charter form of government. R.I. Const. art. 6, sec. 10. Consequently, given the affirmative grant of such power in the Constitution, the General Assembly could exercise and throughout the nineteenth and twentieth centuries did exercise its appointive power in respect to members of the Supreme Court until the adoption of article 10, section 4, in 1994, and in respect to administrative, agencies, until the present time. The General Assembly elected judges of the Superior Court from the time of the court's establishment in 1905 until the power of appointment was conferred upon the governor by P.L.1935, ch. 2254, § 7. The General Assembly also elected judges of the District Court from the time of that court's founding in 1886 until the power of appointment was conferred upon the governor by statute in P.L.1935, ch. 2253, § 1. Both statutes provided for appointment of these judges by the governor with advice and consent of the Senate. Thus, the appointive power of the General Assembly continued well into the 20th century. Rhode Island's tradition of legislative supremacy has been modified significantly by the Legislature itself, but rarely as a result of constitutional limitations as occurred with the adoption of article 10, section 4, in 1994.

The framers of our Constitution in 1842 and in 1986 have treated the executive power quite differently than did the framers of the federal Constitution. First, they included no specific appointment clause similar to that contained in the federal Constitution. Secondly, they deliberately fragmented and distributed the executive power among four elected general officers. The Governor is designated as Chief Executive. However, the Attorney General exercises the vast powers of public prosecution, which under the federal Constitution are implemented by a presidentially appointed Attorney General. The Secretary of State exercises a significant number of executive functions, including the implementation of election statutes, the keeping of records, the oversight of the Uniform Commercial Code, and the promulgation of a myriad of reports. The General Treasurer is the custodian of the funds of the state and also performs a number of executive functions relating to investments, management of the victims' indemnity program, and a number of other duties which would be performed in the federal system by an official appointed by the President.

An amendment to include specific language curbing the well-known appointive power of the General Assembly was proposed at the Constitutional Convention of 1986 (convention), only to be tabled in committee. Constitutional Convention Committee on Ethics, minutes of May 22, 1986, at 89. In light of this governmental history, it seems very doubtful indeed that the convention intended to confer upon the ethics commission the power to amend the constitutional framework of government when the convention itself was unwilling to do so. It is far more reasonable to infer from the proceedings of the convention that the ethics commission was designed to deal with individual conduct and not governmental structure.

■ We view the authority conferred by article 3, section 8, of the 1986 State Constitution as empowering the ethics commission to draft, adopt, and enforce ethics codes that proscribe certain conduct by state and local government personnel subject to its regulation. That, in our considered opinion, is the Constitution's delineated charge from the people to the commission. In order to enable the com-

mission to effectively carry out that charge, the Constitution also provides that the General Assembly enact legislation to establish the commission on a non-partisan basis and delegate to the commission authority to investigate violations of any code it might promulgate, along with authority to impose penalties for violations thereof. This charge was fulfilled by the Legislature through the enactment of G.L. 1956 §§ 36–14–12, 36–14–13, and 36–14–14. If and when any legislator who presently serves on, or who in the future may serve on, any governmental public board, commission, or agency is charged with or suspected of any conduct amounting to or resulting in a conflict of interest, the commission has clear authorization pursuant to article 3, section 8, and §§ 36–14–12 and 36–14–13 to investigate, charge, and try that legislator or any other board, commission, or agency member or any public employee for having allegedly engaged in prohibited conduct under the code of ethics.

In such a case, a hearing must be conducted in accordance with the procedural safeguards set forth in § 36–14–13. If the commission should find that the code of ethics has been violated, the commission can then enter a cease and desist order against the violator, impose a civil penalty of up to $25,000 for each violation, refer the matter to the Attorney General for criminal prosecution if appropriate, § 36–14–13, or finally, remove the violator from his or her public office or position pursuant to § 36–14–14.[3] Nothing contained in article 3, section 8, of the 1986 Constitution authorizes or empowers the ethics commission to adopt a regulation that presumes and predetermines *a priori*, without any evidence of violation and without providing a hearing, that every member of the General Assembly who now serves or will in the future serve on any public board, commission, or agency, or who has nominated, or who hereafter should nominate any person for appointment to such governmental entity is automatically guilty of a conflict of interest or abuse of position. Moreover, nothing contained in article 3, section 8, authorizes the ethics commission, acting solely upon a predetermined assessment that a conflict of interest exists, to impose as a penalty the global exclusion of General Assembly members from all public governmental boards, commissions, and agencies. Neither does article 3, section 8, authorize the commission to remove from the General Assembly all power to appoint persons—including legislators—to public governmental boards, agencies, and commissions.

The regulation before us is violative of at least two basic constitutional principles. The first is the basic constitutional right to which all persons including members of the General Assembly are entitled. A state regulation that assumes and prejudges the guilt of a particular class or segment of persons who are subject to the regulation is not valid. We continue to honor the ancient and venerable principle of justice that is firmly embedded in our state's jurisprudence, which proclaims that a person's innocence is presumed until proven otherwise before an impartial tribunal. We believe that members of the General Assembly, contrary to what the ethics commission's Regulation 5014 appears to presume, remain within the class of our citizenry who are entitled to the benefit of that venerable presumption. The ethics commission cannot relegate legislators—and only legislators—to the category of status offenders.

We are not alone in commenting on the regulation's self-executing presumption of universal conflict of interest and conclusive guilt based on status as a legislator. On August 9, 1996, Professor Hazard, prior to the commission's adoption of Regulation 5014, advised the chairperson of the ethics commission, in pertinent part as follows:

---

3. The commission's authority to remove from office does not extend to those office holders subject to impeachment. G.L.1956 § 36–14–14 and R.I. Const. art. 3, sec. 8.

"In my opinion proposed Section 5013A [enacted as Regulation 5014] exceeds the authority conferred on the Commission by the Rhode Island Constitution. If that authority is challenged in legal proceedings, as it may well be, the Rhode Island Supreme Court could reach the same conclusion.

\* \* \*

"In arriving at this opinion I have reviewed the text of the enabling Constitutional provision, set forth above: the discussions of this provision in the convention at which it was adopted; the opinion of the Rhode Island Supreme Court, *In Re Opinion to the Governor: M.P. 91–577*, 612 A.2d 1 (1992); the comments submitted to the Ethics Commission concerning proposed Sections 5013 and 5013A; and certain other materials provided to me by [the commission's legal counsel].

"Proposed Section 5013A addresses the problems of ethics in government in terms of *a prophylactic restriction rather than a prohibition or limitation on specified types of conduct. That is, proposed Section 5013A debars a member of the Assembly from assuming a position on quasi-public boards from which the member could engage in ethically improper conduct, without regard to whether the member actually engages in such conduct.* In contrast, proposed Section 5013 defines various kinds of ethically improper conduct on the part of members of the Assembly and prohibits them from engaging in such conduct. *In my opinion there is a great difference in the concept of such a prophylactic restriction and the concept of specific prohibitions,* particularly *where the prophylactic restriction is applicable to elected legislative representatives.* The text of article 3, Section 8, [of the R.I. Constitution] empowers the Commission to address 'conflicts of interest, confidential information, use of position, contracts with government agencies and financial disclosure.' *These are categories familiar in the field of government and professional ethics. As such they are the basis of prohibitions, limitations and requirements of disclosure in ethical codes and statutes adopted at various levels of government in this country.*

"In connection with proposed Section 5013A particular note should be taken of the term 'use of position' in Section 8. This term clearly connotes authority on the part of the Commission to prohibit conduct that involves wrongful 'use of position.' However, *wrongful use of position in government necessarily contemplates incumbency in such a position.*" (Emphases added.)

Our colleague in his individual advisory opinion chides us for alluding to the opinion of Professor Hazard regarding the scope of permissible regulation by the ethics commission. We recognize that this Court is not bound by the opinions of outstanding academics, and we note that our colleague cites in profusion numerous secondary sources including law review articles, treatises, and even various quotations from the Bard of Avon whose unparalleled literary talents were not matched by his exposition of political or jurisprudential theory. Indeed, in his famous tragedy *Richard II,* he expresses through John of Gaunt his lyrical and unalloyed admiration for England with the following panegyric:

"This royal throne of kings, this sceptered isle,
This earth of majesty, this seat of Mars,
This other Eden, demi-paradise,
This fortress built by Nature for herself,
Against infection and the hand of war,
This happy breed of men, this little world,
This precious stone set in the silver sea,
Which serves it in the office of a wall,
Or as a moat defensive to a house
Against the envy of less happier lands;
This blessed plot, this earth, this realm, this England \* \* \* "

William Shakespeare, *Richard II*, act 2, sc. I.

It is even more remarkable that this lyrical praise was sung by the Bard at a time (1595) when England was an autocracy. This was long before her parliamentary system of government was admired by political philosophers in the age of the enlightenment.

Without in any way diminishing our admiration for the noble Shakespeare, Professor Hazard is perhaps the most outstanding expert in the field of ethics. He has not only written copiously on this subject, but has recently completed a term as Director of the American Law Institute. Professor Hazard served as reporter for the committee which prepared the Model Rules of Professional Conduct from 1978 to 1983. He served as consultant on the Code of Judicial Conduct for the American Bar Association from 1970–1972. He served as Executive Director of the Fellows of the American Bar Foundation from 1964 to 1970. He has served as a Professor of Law at the University of California at Berkeley, as Professor of Law at the University of Chicago, and as Sterling Professor of Law at Yale University from 1986 to 1994. He is currently serving as a Professor of Law at the University of Pennsylvania. It is rare that one has the benefit of a specific opinion of such a persuasive secondary source that is directly applicable to the question at hand. By contrast the numerous references of our colleague to various articles apply only by analogy and are not specifically addressed to the question that we must answer. We would suggest that Professor Hazard's qualifications are at least equal to those of any of the authors cited by our colleague. We concede that he does not write in blank verse, but his commentary is eloquent and persuasive.

■ The second and perhaps more crucial flaw in Regulation 5014 is its intended scope. By clear directive, the regulation serves to summarily remove from the General Assembly any authority to appoint or to recommend appointees, from within or without its membership, to any state government board, commission, agency, quasi-public board, authority, corporation, or council, except to any such entity that functions solely in an advisory capacity or exercises solely legislative functions. The 1986 State Constitution in no manner empowers or authorizes the ethics commission to restructure and reorganize the constitutional framework of our state government. The ethics commission simply lacks constitutional authority to modify the structure of Rhode Island's government. Rather, article 3, section 8 of our constitution grants to the ethics commission "the limited and concurrent power to enact substantive ethics laws[,]" *In re Advisory Opinion to the Governor*, 612 A.2d at 14, and to investigate and sanction violations thereof. *Id.* at 10–11. Like any other administrative agency, the commission may promulgate regulations not inconsistent with its delegated authority, subject to review by the judiciary, the "final arbiter" of the validity of such regulations. *Clarke*, 714 A.2d at 600 (citing & quoting *DeAngelis v. Rhode Island Ethics Commission*, 656 A.2d 967, 970 (R.I.1995)). *See also* § 36–14–9(a)(15)(b) (Administrative Procedures Act applicable to the ethics commission); § 36–14–15 (any action by ethics commission shall be subject to judicial review); G.L.1956 § 42–35–7 ("The validity or applicability of any rule may be determined in an action for declaratory judgment in the superior court * * * .").

■ Moreover, the commission may not act inconsistently with the constitution. *See* R.I. Const. art. 1, sec. 1. "[T]he commission, like any other governmental body, is subject to many of the usual checks and balances associated with our tripartite form of government * * *." In re *Advisory Opinion to the Governor*, 612 A.2d at 18. The commission, for example, may not create regulations that seriously impinge upon the executive or the legislative branch's ability to perform their duties, *id.* at 19, or "assume powers that are central

or essential to the operation of the Governor's office or of the General Assembly." *In re Advisory from the Governor*, 633 A.2d at 675.

■ Nor may the commission interpret the constitution and enforce its interpretation via regulation. The judicial branch, not the ethics commission, is the "ultimate interpreter of the Constitution." *City of Pawtucket v. Sundlun*, 662 A.2d 40, 58 (R.I.1995) (quoting *Baker v. Carr*, 369 U.S. 186, 211, 82 S.Ct. 691, 706, 7 L.Ed.2d 663, 682 (1962)). Accordingly, it has been our long-standing and consistent opinion that questions concerning the governmental structure of this state are constitutional issues that may be determined only by the judiciary. *See G. & D. Taylor & Co.*, 4 R.I. at 361; *see also In re Advisory from the Governor*, 633 A.2d at 675 ("This court has reserved the power to decide, on a case-by-case basis, whether the actions of the [ethics] commission have violated the separation-of-powers doctrine.").[4]

■ We must take issue with our colleague's assertion that Regulation 5014 is entitled to deferential review by this Court and that it must be presumed to be valid unless proven to be invalid beyond a reasonable doubt. It is true that a legislative rule is binding on a court as would be a statute, but only if it is the product of an exercise of delegated legislative power. *Lerner v. Gill*, 463 A.2d 1352, 1358 (R.I. 1983). In order to achieve validity, a legislative rule must be within the power granted by the General Assembly and must be within the parameters of statutes that define the powers of such agency. *Id.; see also Parkway Towers Associates v. Godfrey*, 688 A.2d 1289, 1293 (R.I.1997); *In re Advisory Opinion to the Governor*, 627 A.2d 1246, 1248 (R.I.1993). This proposed regulation is obviously not authorized by an act of the General Assembly. Rather it purports to derive its authority directly from the constitution itself. In order to determine its validity, this Court must construe the constitution. It is well settled that this Court is the only body authorized to finally determine the constitutionality of a statute. *Sundlun*, 662 A.2d at 58; *Payne & Butler v. Providence Gas Co.*, 31 R.I. 295, 313, 77 A. 145, 153 (1910). *A fortiori*, it must exercise its independent judgment to determine the constitutionality of a regulation.

This Court, therefore, must construe the constitution in order to determine the validity of the proposed regulation. We would abdicate our basic function if we gave deference to the interpretation by the ethics commission of the constitutional provision upon which its authority purportedly rests.

The ethics commission contended that legislative appointments to executive agencies create an inherent conflict of interest. Given the commission's authority under article 3, section 8, of our constitution, to draft provisions that regulate conflicts of interest, the commission has argued that it acted well within its power to prohibit such a practice. We unequivocally disagree. Such an arrangement is not inherently unethical. It is all too obvious to emphasize that any system of government, whether it be the tripartite federal system adopted by the framers of the United States Constitution or a parliamentary system adopted by many nations, may be operated ethically. Likewise, any system may be operated in an unethical manner, depending upon the officials who may from time to time be placed in charge of the government.

Members of the Legislature are not the only persons who may act unethically. Indeed, not only have Presidents of the United States been impeached by the House of Representatives for alleged unethical and illegal behavior, so too have legislators been accused of self-dealing and cronyism, but no more frequently than such accusa-

---

4. The Legislature, of course, could voluntarily abstain from making such appointments. A self-imposed restriction does not alter the structure of government and therefore is of no constitutional moment.

tions have been leveled against members of the executive department, including governors, gubernatorial appointees, and governmental employees. *See United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); Iain Crawford, *The Profumo Affair: A Crisis in Contemporary Society* (1963).

In *Davis v. Hawksley*, 119 R.I. 453, 379 A.2d 922 (1977), this Court, in considering the question of whether dual office holding automatically constituted a conflict of loyalty, stated that "the existence of a possible conflict of loyalty does not turn upon a determination of whether the offices are naturally incompatible but rather whether there is an 'explicit prohibition in the constitution [which] makes them incompatible * * *.'" *Id.* at 456, 379 A.2d at 924 (quoting *Opinion to the Governor*, 83 R.I. 370, 374, 116 A.2d 474, 475 (1955)). Again, the question of the structure of our state government is not an ethical question, but a constitutional one. We believe the ethical quality of a government is more affected by the individuals who serve from time to time in public office than by the structure of its government or the distribution of powers. Our constitution does not require a prophylactic ban on the historic exercise of appointive power and participation by the General Assembly.

While acknowledging the "continual hardships in discerning the theoretical requirements for what is defined as ethical[,]" *In re Advisory from the Governor*, 633 A.2d at 667, we have historically eschewed prophylactic bans in favor of case-by-case determinations because "[a] particular profession or occupation should not carry a stigma simply as a result of public perception, for it is the human spirit that is common to all, and that spirit can take on different faces, both praiseworthy and contemptible." *Id.*

In *Town of Lincoln v. Lincoln Lodge No. 22*, 660 A.2d 710 (R.I.1995), we reviewed the ethics commission's conclusion that the inclusion of any police chief in his or her police force's collective bargaining units was a *per se* violation of the Rhode Island Code of Ethics. The ethics commission reasoned that because police chiefs exercised supervisory power over all police officers in his or her command, membership in a collective bargaining unit with these same officers created inherent "conflicts and problems" that violated the code. *Id.* at 713–14. We rejected the commission's approach, reasoning that "[g]iven the varying degrees of power and responsibility chiefs of differing locales possess, we cannot say that * * * including chiefs of police as members of local town and city police bargaining units * * * [is] per se violat[ive] [of the Code of Ethics]." *Id.* at 715. Rather, we held that "whether such a labor classification results in a 'severe conflict of interest' * * * ultimately turns on an evaluation of a particularized factual situation" which requires a "case-by-case type of analysis." *Id.*

Moreover, in *In re Advisory from the Governor*, 633 A.2d at 667, we upheld ethics commission Regulations 36–14–5006 and 5007, requiring elected and appointed state officials to wait one year after leaving their position before seeking or accepting certain categories of public employment. But in so holding, we pointed out that "[w]e do not view the revolving-door legislation as [a] per se restrict[ion]," because the waiting period was a temporary, *de minimis* impediment, *id.* at 670, and the regulations allowed the ethics commission to grant case-by-case exceptions.[5] *Id.* at 672.

Furthermore, we disagree with the commission's assertion that article 3, section 8, allows it to reach any conflict of interest. The commission defines conflict of interest

---

5. Our colleague who disagrees fails to weigh the importance and significance of these limitations on the ban. We refrain from responding point-by-point to the lengthy exposition of the contrary position. Rather, it is our opinion that its conclusions are wholly unsupportable and its analyses flawed. Colorful metaphor is no substitute for legal analysis.

as "any circumstances where divided loyalties may result, whether the divided loyalty stems from personal or other interests," or "any situation in which conflicting or divided loyalties may arise, whether or not the conflict involves financial interests or gains." If the commission is correct that it can regulate every case involving divided loyalties, then the commission has virtually limitless power over any decision made by members of state and local government, because decision-making is fundamentally about choosing one conflicting interest over another. Most assuredly, the ethics commission does not enjoy such plenary power and cannot act in ways inconsistent with the Rhode Island Constitution, including its attempt at restructuring government by enacting Regulation 5014.

While we decline to sketch the boundary that delineates legitimate action by the ethics commission, as that question is not before us, we deem it clear that the function of the commission is to adopt regulations that would prevent improper conduct or self-dealing on the part of elected or appointed officials, not to create changes in the structure of government on the basis of the commission's belief that such change would lead to better ethical conduct. As we said in *In re Advisory Opinion to the Governor*, 612 A.2d at 19, "the commission may not set standards that seriously impinge upon the executive or the legislative branch's ability to perform the usual or ordinary duties for which each is elected, including the appointment of various officials to public office."

The delegates to the 1986 convention that redrafted and revised the state's 1843 Constitution are presumed to have been aware of and to have considered what this Supreme Court said in *Davis v. Hawksley*, 119 R.I. 453, 379 A.2d 922 (1977), and *Gorham v. Robinson*, 57 R.I. 1, 186 A. at 837 (1936), *see ante*. Nevertheless, it chose not to redraft or revise the provision, originally adopted in the 1843 Constitution, that "[t]he [G]eneral [A]ssembly shall continue to exercise the powers it has

heretofore exercised, unless prohibited in this Constitution." R.I. Const. art. 6, sec. 10.

Consequently, we discern no authority in our 1986 State Constitution suggesting that any of its provisions were intended to remove from the General Assembly its long acknowledged authority and practice to appoint individuals from its membership to state governmental public boards, commissions, or agencies. If, then, the people who constitute the electorate did not take that right and authority from the General Assembly, may the ethics commission do so by virtue of its limited authority to enact a substantive code of ethics? Our response is conclusively in the negative.

In summary, we are of the opinion that the ethics commission lacks the power to enact Regulation 5014, which fundamentally alters the constitutional structure of this state. Rhode Island has a long history of legislative service on and appointments to executive boards and commissions. By prohibiting this practice, Regulation 5014 redraws the basic scheme of Rhode Island government by divesting the Legislature of its historically exercised appointive power and investing the same in the executive. On the other hand, the ethics commission can clearly adopt regulations pertaining to the conduct of public officials, subject as we have previously stated to review by this Court. A code of ethics must deal with an individual's behavior. The ethics amendment established an administrative agency to oversee the conduct of public officials; it did not establish an unelected, unaccountable, fourth branch of government. Nor did the amendment create an entity that could expand its powers beyond its specifically delegated authority. The commission, for example, cannot adopt a regulation that "the Governor cannot appoint members of the National Guard" because it would conflict with his powers under the constitution. The commission could, however, adopt a rule that "a public official cannot be a shareholder of a private corporation engaged in certain business prac-

tices," a rule to which this Court would give some deference. No deference would be given to a regulation through which the commission expands its power beyond its constitutional or statutory authority.

The ethics commission is not a constitutional convention. It does not have the power to amend the constitution of this state, nor could it be given such a power. It is not the function of this Court to determine whether the United States federal system is preferable to that of legislative supremacy. We take no position on that issue. It *is* our function to determine what the Rhode Island Constitution as interpreted by this Court permits or commands. When the language and history are clear and unambiguous, as they are with respect to our response to Your Excellency's first question, it is not the role of this Court to render an interpretation fabricated from interstitial constitutional modifications. As is clearly enunciated in article 1, section 1, of our state constitution, only the people of Rhode Island may change the structure of their government, having reserved to themselves such a fundamental and paramount function of government. Article 14, section 1, of the Rhode Island Constitution provides the exclusive means of amending the constitution and such an alteration requires approval "by a majority of the electors voting thereon[.]" We suggest that the sole and proper procedure for restricting legislators from serving on or appointing "any other person" to executive boards and commissions is through an amendment to the constitution approved by the electorate, not by an ethics regulation.

## Conclusion: Question 1

Accordingly, we conclude that adoption of Regulation 5014 by the commission is not authorized by the Rhode Island Constitution, and we therefore answer question 1 as propounded by Your Excellency in the negative.

## Question 2 and Question 3

In respect to questions two and three, we must respectfully decline to address Your Excellency's questions in the context of an advisory opinion.

We held clearly in *In re Advisory Opinion to the Governor*, 113 R.I. 586, 597, 324 A.2d 641, 647 (1974), that this Court will not issue advisory opinions which require a direct or indirect exercise of our fact-finding power. The justices of this Court, when rendering advisory opinions, act "as individuals and not as the judicial department of the state government." *Opinion to the Governor*, 96 R.I. 358, 364, 191 A.2d 611, 614 (1963). Because fact-finding power inheres in the Court as the judicial branch of the state government, judges acting in their individual capacities lack this power and therefore lack the power to issue advisory opinions which implicate fact-finding. *See Advisory Opinion to the Governor*, 113 R.I. at 597, 324 A.2d at 647–48; *Opinion to the Governor*, 96 R.I. at 364, 191 A.2d at 614–15. Consequently, we decline to issue advisory opinions requiring fact-finding.

In order to answer questions two and three, we would be required to make factual determinations in deciding which public and quasi-public boards and commissions are executive in nature. It is undisputed that the composition and function of such entities vary widely. For example, the Commission on Judicial Tenure and Discipline deals with complaints against members of the judiciary, G.L.1956 § 8–16–1, whereas the Rhode Island Ethics Commission is an agency that may combine all three functions of executive, legislative, and judicial nature, even though the commission is not subject to supervision by the executive authority of the governor. There are also the Coastal Resources Management Council, G.L.1956 § 46–23–2, the Rhode Island Economic Development Corporation, G.L.1956 § 42–644, the Commission on Interstate Cooperation, G.L. 1956 § 42–23–1, the American and Irish Cultural Exchange Commission, G.L.1956

§ 42–65–1, the Pesticide Relief Advisory Board, G.L.1956 § 23–25.2–3, and the Legislative Commission on Historical Cemeteries, G.L.1956 § 23–18.3–1, all of which presumably have their own unique structure and purpose. We list only these few of the scores of public and quasi-public boards and commissions to illustrate that the classification of boards as executive or otherwise requires fact-intensive investigation of the nature, purpose, membership, and operation of each board and commission.

Moreover, the various briefs filed by the *amici curiae* have reflected that the number of public boards and commissions to which legislative members have been appointed is large but not readily ascertained. For example, a brief filed on behalf of the Governor suggested that there are over 75 public boards on which the General Assembly has designated over 200 places for legislators. In contrast, the brief filed on behalf of the Majority Leader of the Senate asserted that there are currently "no less than 166 permanent boards and commissions to which the Senate Majority Leader, the Senate Minority Leader and/or the Lieutenant Governor (in his capacity as President of the Senate) make appointments. Members of the Senate serve on more than 140 of those boards and commissions." Consequently, even determining the number of boards to which our advisory opinion would apply would require the exercise of fact-finding powers.

Our colleague suggests that in the future the members of this Court may become better educated concerning what they themselves have said about the subject addressed in these opinions when controversies may arise in respect to these same legal issues. We do not share the same Olympian disdain for our advisory opinions, although we realize that they are of limited precedential effect. They may be persuasive although not binding upon future or even the present members of this Court. We assure Your Excellency that our minds are open in respect to issues that might be raised pursuant to questions two and three propounded by Your Excellency. We must refrain from discussing or even alluding to the merits of these issues when we have declined to attempt to answer them by reason of the limitations of our ability to deal with the myriad of factual questions that would underlie these issues. We, of course, stand ready to deal with such issues as may be raised in litigated cases from time to time, including constitutional issues similar to those presently propounded. Our potential personal preferences for the philosophic advantages of the doctrine of separation of powers included explicitly in the federal Constitution must not and cannot cause us to overlook the fact that it is the Rhode Island Constitution that we are expounding, not the Constitution of the United States or the constitutions of our sister states which may vary widely from our own.

Because we cannot answer Your Excellency's inquiry without an examination of the identity, function, and composition of the numerous public bodies that are the subject of these questions, we decline to address Your Excellency's questions in this present context. Therefore, we defer our response until a litigated case is presented to us with a factual record upon which we more properly can address concrete questions rather than abstractions and hypotheses. Consequently, we must respectfully decline to answer questions two and three propounded by Your Excellency.

/s/ Joseph R. Weisberger
 Joseph R. Weisberger
 Chief Justice

/s/ Victoria Lederberg
 Victoria Lederberg
 Justice

/s/ John P. Bourcier
 John P. Bourcier
 Justice

/s/ Maureen McKenna Goldberg
 Maureen McKenna Goldberg
 Justice

To His Excellency Lincoln Almond, Governor of the State of Rhode Island and Providence Plantations:

By letter dated November 20, 1997, the Governor has asked the Justices of this Court for our advisory opinions on three questions of law pertaining to the validity of legislative participation in appointments to public and quasi-public executive boards, authorities, corporations, commissions, councils, and agencies (executive entities).[1] Pursuant to article 10, section 3, of the Rhode Island Constitution (constitution), "[t]he judges of the supreme court shall give their written opinion upon any question of law whenever requested by the governor or by either house of the general assembly." Because this constitutional command is unequivocal, peremptory, and without qualification, and because it requires the members of this Court to give our written opinions upon *any* question of law *whenever* the Governor requests us to do so, I conclude that, to the extent we are able to respond, it is incumbent upon us to answer the Governor's questions and to provide him with the practical guidance and assistance that he has requested. Most importantly, our responses to these queries necessarily will address the scope of the Governor's present chief-executive powers and duties that are awaiting his performance with respect to the various executive entities of state government.

*See Advisory Opinion to the Governor*, 110 R.I. 1, 5, 289 A.2d 430, 433 (1972) ("[W]e ha[ve] to advise the chief executive only in those instances when the question propounded ha[s] a bearing upon a present constitutional duty presently awaiting performance by the Governor."). These powers are vested in him by the constitution and presently are awaiting his performance vis-á-vis ongoing appointments to existing and recurring vacancies in the membership of these executive entities. Indeed, because the ability of legislators to participate in ongoing appointments to such entities will impact upon the Governor's present constitutional duty to take care that he executes the laws of this state faithfully, the answers that we provide to these questions likely will affect the scope and nature of the Governor's present and future executive duties in this respect.

I

## Power of the Ethics Commission to Adopt Regulation 36–14–5014

The Governor's first question asks us to opine on the validity of a regulation adopted by the Rhode Island Ethics Commission (commission). On May 5, 1997, the commission adopted Regulation 36–14–5014 (Regulation 5014), which will become effective as of July 1, 1999.[2] This regula-

---

1. The three questions are as follows:

 "1) Does Article III, section 8 of the Rhode Island Constitution, which empowers the Rhode Island Ethics Commission to 'adopt a code of ethics, including, but not limited to provisions on conflicts of interest, * * * [and] use of position,' provide the Ethics Commission with the power to adopt Regulation 36–14–5014?

 "2) Is the principle of separation of powers contained in the Rhode Island Constitution properly interpreted in the same fashion as it has been interpreted in the United States Constitution with respect to appointments, such that neither legislators, nor their appointees, may serve on any public body within the executive branch of state government, or state executive, public and quasi-public boards, authorities, corporations, commissions, councils or agencies except those which: (i) function solely in an advi-

 sory capacity; or (ii) exercise solely legislative functions?

 "3) Does the separation of powers principle contained in the Rhode Island Constitution impose any limits whatsoever on legislative appointments to a public board or body (as defined above)? In particular, does the Constitution prohibit legislators and/or their appointees from constituting a majority of the membership of a public board or body? Does the Constitution prohibit appointment of sitting legislators to a public board or body?"

2. "Regulation 36–14–5014 Prohibited Activities—Members of the General Assembly—Restrictions on activities relating to Public Boards

 "(1) No member of the General Assembly shall serve as a member of a Public

tion precludes members of the General Assembly from serving as members of executive entities and from otherwise participating in such appointments. Article 3, section 8, of the constitution—a part of the so-called 1986 ethics amendment to the constitution—authorizes the commission to "adopt a code of ethics including, but not limited to, provisions on conflicts of interest * * * [and] use of position." That same constitutional article and section further provides that "[a]ll elected and appointed officials and employees of state and local government, of boards, commissions and agencies shall be subject to the code of ethics."

In 1992, the Justices of this Court unanimously opined that "the terms of article 3, section 8, expressly confer upon the commission the limited and concurrent power [with the General Assembly] to enact substantive ethics laws." *In re Advisory Opinion to the Governor (Ethics Commission),* 612 A.2d 1, 14 (R.I.1992). In that same opinion, the Justices also concluded that this affirmative grant of legislative power to the commission meant that "the General Assembly is merely limited to enacting laws that are not inconsistent with, or contradictory to, the code of ethics adopted by the commission." *Id.* Accordingly, the Justices were of the opinion that when the people of Rhode Island adopted article 3, section 8, in 1986, they thereby

> Board. No member of the General Assembly shall participate in the appointment, except through advice and consent as provided by law, of any other person to serve as a member of a Public Board.
>
> "(2) For purposes of this regulation, 'Public Board' means all public bodies within the executive branch of state government, and all state executive, public and quasi-public boards, authorities, corporations, commissions, councils or agencies; provided, however, that the foregoing definition shall not apply to any such entity which (i) functions solely in an advisory capacity, or (ii) exercises solely legislative functions.
>
> "(3) The effective date of this regulation is July 1, 1999."

(1) engrafted a new limitation upon what heretofore had been the General Assembly's plenary power to adopt ethics laws for public officials ("the framers of the ethics amendment to the constitution believed that the only means of restoring public confidence in government was to divest the General Assembly of its legislative power regarding ethics," *id.* at 13) and (2) clothed the commission with the legislative authority to enact substantive ethics laws "on" conflicts of interest and misuse of position (among other subjects) that thereafter would bind legislators and other public officials.[3]

## A. Applicable Standard of Review

Regulations that are duly promulgated by an administrative agency like the commission, pursuant to a specific grant of legal authority to do so, are legislative rules that carry the force and effect of law and thus enjoy a presumption of validity. *See Parkway Towers Associates v. Godfrey,* 688 A.2d 1289, 1293 (R.I.1997); *Lerner v. Gill,* 463 A.2d 1352, 1358 (R.I.1983); *see also DiLuglio v. Rhode Island Ethics Commission,* 726 A.2d 1149, 1151 n. 2 (R.I. 1999) (indicating that courts shall presume the validity of the commission's regulations). "Legislative rules are valid if they are within the power granted * * *, are issued pursuant to proper procedure, and are reasonable as a matter of due process."

**3.** A review of the records of the 1986 Constitutional Convention shows that this is exactly what the framers of the ethics amendment intended. *See City of Pawtucket v. Sundlun,* 662 A.2d 40, 45 (R.I.1995) ("Our task in construing constitutions is to give effect to the intent of the framers."). In the words of Delegate Milette: "I believe what we are saying is * * * we would direct that a code of ethics be developed * * * and put the responsibility on the [commission] instead of on the state legislature. Now that takes the fox away from the chickens." Constitutional Convention Committee on Ethics at 59–60 (May 22, 1986). He further stated that "we are all concerned about the state legislature doing it or doing it right, [so] let's take [the authority to enact an ethics code] away from them. Let's give it to another body." *Id.* at 61.

*Parkway Towers Associates,* 688 A.2d at 1293.[4] Moreover, we accord great deference to an administrative agency's interpretation of its enabling law, as reflected in its regulations, "especially when, as here, it is consistent with the overall purposes of the [enabling provision(s) ]." *Id.; see also Pawtucket Power Associates Limited Partnership v. City of Pawtucket,* 622 A.2d 452, 456–57 (R.I.1993) ("[D]eference will be accorded to an administrative agency when it interprets [enabling provision(s) ] whose administration and enforcement have been entrusted to the agency * * * *even when the agency's interpretation is not the only permissible interpretation that could be applied.*"). (Emphasis added.) Indeed, even when the enabling provision(s) empowering an agency to adopt regulations is unclear, we still are required to accord great deference to the agency's interpretation of its authority to act. *See Defenders of Animals, Inc. v. Department of Environmental Management,* 553 A.2d 541, 543 (R.I.1989) ("[T]his court attributes great weight to an agency's construction of a regulatory statute when the statute's provisions are unclear."); *Gallison v. Bristol School Committee,* 493 A.2d 164, 166 (R.I.1985) ("[W]here the provisions of [the enabling law] are unclear or subject to more than one reasonable interpretation, the construction given by the agency charged with its enforcement is entitled to weight and deference as long as that construction is not clearly erroneous or unauthorized.").[5]

Accordingly, because the commission's adoption of Regulation 5014 constitutes a legislative enactment pursuant to an express constitutional provision authorizing such activity, the members of this Court

---

4. Here, the sole question raised by the Governor concerning Regulation 36–14–5014 (Regulation 5014) is whether the commission possesses the constitutional power to adopt this particular provision. Accordingly, while we have not been asked to opine on whether the commission adopted Regulation 5014 pursuant to proper procedure and in a manner and form consistent with the requirements of due process, we should assume, for the purposes of our advisory opinions, that these conditions have been satisfied. Nonetheless, from all that has been presented to us from the administrative record pertaining to the adoption of this regulation, it appears that the commission has indeed complied with the applicable procedural and due-process requirements in enacting Regulation 5014.

5. Because we are not reviewing a finding of law by the commission in a contested, adjudicative proceeding, it is inappropriate for us to conduct a de novo review of the validity of this regulation. Unlike the case of *City of East Providence v. Public Utilities Commission,* 566 A.2d 1305 (R.I.1989), the commission has not issued a ruling in a contested matter that it lacks jurisdiction over a particular litigant because its enabling law does not extend to such an entity. On the contrary, we are faced here with the validity of a legislative rule that was duly promulgated by an agency pursuant to the specific authority granted to the commission by its enabling law, and not with an agency's jurisdictional ruling in a contested, adjudicative proceeding. In cases like this when an agency is acting in a quasi-legislative capacity, we do not review the regulation's validity de novo as if it was a finding in respect to a question of law within the context of an agency adjudicative proceeding. *See, e.g., Parkway Towers Associates v. Godfrey,* 688 A.2d 1289, 1293–94 (R.I.1997), and the cases cited therein. Rather, the regulation "carr[ies] the force and effect of law and enjoy[s] a presumption of validity" because the commission's "administrative interpretation [of its enabling law] is entitled to great deference, especially when, as here, it is consistent with the overall purpose of the [enabling law]." *Id.* at 1293; *accord United States v. Haggar Apparel Co.,* —— U.S. ——, ——, 119 S.Ct. 1392, 1398, 143 L.Ed.2d 480, —— (1999). ("[T]he usual rule [is] that regulations of an administrative agency warrant judicial deference."); *Atlantic Mutual Insurance Co. v. Commissioner of Internal Revenue,* 523 U.S. 382, 389, 118 S.Ct. 1413, 1418, 140 L.Ed.2d 542, 549 (1998) (holding that when a term in the Internal Revenue Code is ambiguous, "the task that confronts us is to decide, not whether the Treasury regulation represents the best interpretation of the statute, but whether it represents a reasonable one"); *see also Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694, 703 (1984) (holding that if the enabling law is silent or ambiguous concerning the specific issue under review, then a reviewing court should defer to any "reasonable interpretation" made by the agency).

not only must presume its constitutionality, but we cannot opine that it is invalid unless the parties opposing the regulation's validity establish its constitutional repugnance beyond a reasonable doubt. *See City of Pawtucket v. Sundlun*, 662 A.2d 40, 45 (R.I.1995) ("Specifically, this court will not invalidate a legislative enactment unless the part[ies] challenging the enactment can prove *beyond a reasonable doubt* to this court that the [enactment] in question is repugnant to a provision in the constitution."); *see also Kennedy v. State*, 654 A.2d 708, 712 (R.I.1995). Moreover, we have stated repeatedly that "this court will presume legislative enactments * * * to be constitutional when such a construction is reasonably possible." *In re Kyle S.*, 692 A.2d 329, 334 (R.I.1997). "If a legislative enactment is susceptible of more than one construction, we shall adopt the construction that comports with constitutional imperatives." *Id.* Further, "this court's evaluation of legislative enactments has been extremely deferential; * * * *we have interfered with such enactments only when the legislation at issue could palpably and unmistakably be characterized as an excess of legislative power.*" *Sundlun*, 662 A.2d at 44–45 (emphasis added).

Because Regulation 5014 is a legislative enactment, the above-cited authorities apply to the first question that the Governor has placed before us. Hence, the standard of review that we must exercise is not merely one that is respectful of the commission's constitutional authority to enact ethics regulations. Rather, we must apply the most deferential standard of judicial review that an appellate court can use in exercising its authority to interpret the law: namely, unless the opponents of this regulation can prove to us that the regulation is unconstitutional beyond a reasonable doubt because it can "palpably and unmistakably be characterized as an ex-

cess of legislative power," *id.*, we must uphold its validity. Because I do not believe that the opponents have been able to surmount this high legal hurdle and because I am otherwise convinced that the commission acted well within its constitutional powers when it adopted Regulation 5014, I conclude that the commission did not exceed its constitutional powers when it promulgated this particular ethical restraint.

## B. Regulation 5014 Is a Valid Ethics Provision

### 1. The Scope of Regulation 5014 Is Confined to Executive Entities and Does Not Extend to All Governmental Public Boards or Commissions

Regulation 5014 does not apply to any and all public boards, commissions, agencies, and authorities. Rather, by its terms, it is limited to *executive* entities; that is, (a) "public bodies *within the executive branch of state government*" and (b) "state *executive*, public and quasi-public boards, authorities, corporations, commissions, councils or agencies." Regulation 5014(2) (emphasis added). Although Regulation 5014 does not contain a further definition of what constitutes an "executive" governmental entity, those governmental entities that function in a non-executive capacity, that are legally independent of the executive department and are nonpartisan in the composition of their membership, or that function solely as advisory boards or as legislative commissions, do not qualify as "executive" entities and hence are excluded from its scope. Thus, for example, the commission itself—notwithstanding its investigative and prosecutorial functions—would not constitute an "executive" entity because of its constitutionally mandated, "independent non-partisan" status. R.I. Const. art. 3, sec. 8.[6] Nor

---

6. One cannot conclude that the commission is an executive entity subject to Regulation 5014 merely because its powers include certain investigative and prosecutorial functions that are executive in nature. After all, the same could be said about the Commission on Judicial Tenure and Discipline, and for that matter, about any impeachment committee that

would an administrative agency like the Commission on Judicial Tenure and Discipline (CJTD), *see* G.L.1956 chapter 16 of title 8, qualify as an executive entity because it functions merely as a reference source for this Court. *See In re Almeida,* 611 A.2d 1375 (R.I.1992) (holding that the findings and recommendations of the CJTD, which acts "as a reference source" for this Court, are not binding on the Court and do not usurp its inherent powers). And inter-governmental advisory entities like the recently formed Administrative Adjudication Court Task Force are also non-executive in character and function. Therefore, while legislative membership on or legislative participation in the selection of the membership for such entities may raise other legal questions (for example, in the case of the commission, whether such legislative involvement complies with the constitution's "independent non-partisan" mandate, R.I. Const. art. 3, sec. 8, or in the case of the CJTD, with the constitution's distribution to and vesting of the judicial power in the judicial department, art. 10), such activity would not run afoul of Regulation 5014 nor would it violate the constitution's distribution of the executive power to the executive department and its vesting of the chief-executive power in the Governor.

Although a particular office's or administrative entity's "executive" status vel non

should be decided on a case-by-case basis, it would appear, as a general proposition, that many administrative agencies and other non-advisory governmental entities and positions that the Legislature creates to carry out, regulate, administer, or execute some aspect of the laws of this state are either within the executive branch of state government or are otherwise predominately executive in character and function. Therefore, they would be subject to Regulation 5014 and to the Governor's chief-executive power and hence beyond the scope of whatever appointment powers the Legislature may enjoy. *Accord Federal Election Commission v. NRA Political Victory Fund,* 6 F.3d 821, 827 (D.C.Cir.1993) ("[T]he mere presence of agents of [the Legislature] on an entity with executive powers offends the Constitution."). But others, like the CJTD, may not be. *Compare, e.g., Humphrey's Executor v. United States,* 295 U.S. 602, 628, 55 S.Ct. 869, 874, 79 L.Ed. 1611, 1619 (1935) (holding that the Federal Trade Commission is an independent administrative agency that "cannot in any proper sense be characterized as an arm or an eye of the executive") *with Buckley v. Valeo,* 424 U.S. 1, 137–41, 96 S.Ct. 612, 691–93, 46 L.Ed.2d 659, 755–57 (1976) (holding that the Federal Election Commission was unconstitutionally composed of legislative appointees).[7] In any event, the scope of

the House of Representatives may form in response to allegations of official misconduct. Yet, no one would seriously contend that these are executive entities subject to Regulation 5014. If the commission were a typical administrative agency created by the General Assembly and endowed with such executive functions, I might be inclined to agree with such an assessment, especially if such functions tended to predominate vis-á-vis the other authorized activities of the agency. But unlike most other state administrative agencies, the commission derives its ultimate enabling authority not from the Legislature but from the constitution itself. Moreover, to assure that the commission would not be under the influence of either the executive or legislative departments, the constitution mandates that the commission shall be both "independent" and "non-partisan." Thus, notwith-

standing its power to engage in certain executive functions, the commission's "independent non-partisan" status—conferred by the people of this state via their approval of the ethics amendment to the present constitution—prevents it from qualifying as an "executive" entity and therefore from falling within the scope of Regulation 5014. Nonetheless, because the constitution itself requires the General Assembly to establish the commission as an "independent non-partisan" entity, legislators are barred by these provisions from serving as members of the commission.

7. The opponents of Regulation 5014 assert that it would invalidate scores of governmental boards and commissions that currently exist and that perform a number of important governmental functions. Such a sky-is-falling prediction, however, should not be allowed to

Regulation 5014 is limited to executive governmental entities. Therefore, in addition to excluding from its scope "any governmental board or commission" that "functions solely in an advisory capacity, or [that] exercises solely legislative functions," Regulation 5014(2), it also excludes non-executive entities.

### 2. The Plain Meaning of the Relevant Constitutional Text Shows that the Commission Possesses the Power to Adopt this Regulation

In interpreting a constitutional provision that is clear and unambiguous, we must accord its provisions their plain and ordinary meaning. *See In re Advisory Opinion to the Governor (Appointment to Fill Vacancy In Office of Lieutenant Governor)*, 688 A.2d 288, 291 (R.I.1997) (addressing the Governor's constitutional authority to fill a vacancy in the office of Lieutenant Governor). "[N]o word or section must be assumed to have been unnecessarily used or needlessly added." *Kennedy v. Cumberland Engineering Co.*, 471 A.2d 195, 198 (R.I.1984). Although the 1986 ethics amendment to the constitution does not define what is meant by "a code of ethics" as that phrase is used in article

3, section 8, the plain meaning of the term "ethics" when Rhode Islanders adopted this amendment included "[t]he rules of conduct recognized in certain associations or departments of human life." 1 Oxford English Dictionary 312 (1st ed.1971) (defining "ethics").[8] The constitution further tells us that such an ethics code shall include, but not be limited to, "provisions on conflicts of interest" and on "use of position." R.I. Const. art. 3, sec. 8. Accordingly, to establish the rules of conduct for Rhode Island's public officers and employees, the people empowered the commission to adopt provisions "on" (among other subjects) conflicts of interest and misuse of position that henceforth would constitute "[t]he rules of conduct recognized in certain associations or departments of [Rhode Island public] life." 1 Oxford English Dictionary at 312.

Moreover, in empowering the commission to adopt an ethics code, Rhode Islanders also expressly authorized the commission to proscribe and punish conduct that might tend to engender conflicts of interest and misuse of government office holders' public positions. Such a construction is consistent with the language in article 3, section 7, of our constitution that "public officials and employees must adhere to the

---

undermine the validity of the regulation for at least three reasons. First, the regulation would not invalidate any and all boards and commissions deemed to constitute executive entities merely because legislators have participated in the selection of one or more of their members. Rather, at most, it would require the membership of these entities to conform in the future to Regulation 5014—a legislative correction that, in many instances, could be effectuated without these entities skipping an administrative heartbeat, let alone expiring on the operating table. Second, because the Justices of this Court cannot perform a fact-finding function relative to the questions posed herein, *see In re Advisory Opinion to the Governor*, 113 R.I. 586, 597, 324 A.2d 641, 647–48 (1974), we are barred from undertaking any definitive judicial determination of whether particular boards and commissions are subject to Regulation 5014 because they are within the executive branch, are executive in nature or function, or are

otherwise subject to executive control, and if so, how many such entities would be affected by the regulation. Thus, the predicted legal deaths of these entities if Regulation 5014 were to be upheld is not only premature, but greatly exaggerated on this nonexistent factual record. Third, even if, arguendo, we were permitted to do so and could undertake such an analysis, our primary task in answering this first certified question is to assess the power of the commission to enact Regulation 5014, and not to interpret the regulation's constitutionality by making unjustifiable assumptions that it would cause such dire consequences predicated on what amounts to little more than guesswork about its asserted wholesale impact on innumerable government entities.

8. Webster's Third New International Dictionary 780 (3th ed.1971) also defined "ethics," inter alia, as "the principles of conduct governing an individual or a profession."

highest standards of ethical conduct, respect the public trust and * * * *avoid the appearance of impropriety.*" (Emphasis added.) [9] Thus, the constitution endowed the commission with the legislative responsibility to adopt an ethics code that would enable public officials and employees to adhere to "the highest standards of ethical conduct" and to "avoid the appearance of impropriety." Such a code would include provisions "on" conflicts of interest and misuse of position so that legislators and other public officials could comply with these standards and thereby "avoid the appearance of impropriety." Accordingly, the commission was entitled to conclude that, for legislators to avoid the appearance of impropriety as required by article 3, section 7, of our constitution, they would have to avoid engaging in certain conduct and activities that might subject them to conflicts of interests or expose them to potentially conflicting demands on their time, their loyalties, or their responsibilities as legislators.

Among the various types of conduct and activities that could result not only in the appearance of impropriety, but also in actual conflicts of interest and misuse of legislative office, would be legislators holding one or more potentially incompatible executive-department positions or otherwise participating in such executive appointments. Such activity could, at a minimum, result in the appearance of impropriety in a state where (1) "[t]he executive can do no legislative act, nor the legislature any executive act," *Payne & Butler v. Providence Gas Co.*, 31 R.I. 295, 317, 77 A. 145, 154 (1910) (quoting Thomas M. Cooley, *A Treatise on the Constitutional Limitations*, 242 (Little, Brown, and Co. 7th ed.1903)), and where (2) legislators are forbidden from serving on any boards whose decisions "are subject, in some degree at least, to the revisory power" of the General Assembly, *see. e.g., Opinion of the Justices*, 67 R.I. 197, 202, 21 A.2d 267, 270 (1941) (opining that legislators could not serve on the board of elections).[10] Given our constitution's dis-

9. It may well be, as my colleagues contend, that "the ethical quality of a government is more affected by the individuals who serve from time to time in public office than by the structure of its government or the distribution of powers." But, as James Madison observed long ago: "If men were angels, no government would be necessary. If angels were to govern men, neither external or internal controls on government would be necessary. In framing a government which is to be administered by men over men, the great difficulty lies in this: You must first enable the government to control the governed; and in the next place, oblige it to control itself." The Federalist, No. 51, at 349 (Wesleyan Univ. Press 1961). Here, the framers of our constitution in 1986 enabled the commission to adopt an ethics code that would oblige the government and its officials to control themselves. Like Madison, they believed that "[i]t may be a reflection on human nature, that such devices should be necessary to control the abuses of government." *Id.* Thus, the question we face is whether the commission has the constitutional power in adopting an ethics code for public officials to proscribe conduct (for example, participation in executive-office holding by legislators) that, in its judgment, would tend to result in conflicts of interest, misuse of legislators' offices, and/or the appearance of

official impropriety. Because avoidable conflicts of interest may confront even the best individuals who may serve from time to time in public office if the system of government is one that allows such officials to be placed (or to place themselves) in such compromising positions, I conclude that the commission has the power to promulgate ethics-code provisions such as Regulation 5014.

10. The fact that other systems of government, most notably the British parliamentary system, not only might countenance such participation in multiple-office holding by legislators and other public officials, but also depend in particular upon legislative participation in executive-department functions is, of course, totally irrelevant when analyzing the validity of this regulation. Not only did the American colonies rebel against this very system of government when this country was formed, *see generally* Gordon S. Wood, *The Creation of the American Republic 1776–1787*, 158 (1969) (hereinafter Wood) ("Americans felt compelled to isolate their legislatures from any sort of executive influence or impingement, thus setting American constitutional development in an entirely different direction from that of the former mother country."), but *every state, including Rhode Island, eventually adopted and constitutional-*

tribution of all the powers of government into three separate departments, art. 5, the separate vesting of the legislative power with the General Assembly, art. 6, sec. 2, of the chief-executive power with the Governor, art. 9, sec. 1, and of the judicial power with the state's courts, art. 10, sec. 1, and given the common-law prohibition on legislators serving in public offices that would be subordinate to or "subject, in some degree," to the General Assembly's revisory powers, *Opinion of the Justices*, 67 R.I. at 202, 21 A.2d at 270 (opining that a member of the General Assembly may not serve as a member of the state board of elections because "the decisions of the board * * * are subject, in some degree at least, to the revisory power of each house of the general assembly"), the commission was entitled to conclude that legislators' participation in appointments to various executive entities might lead to or create an appearance of impropriety, if not outright conflicts of interest, with their primary law-making responsibilities. *See Cranston Teachers Al-*

liance *Local No. 1704 AFT v. Miele*, 495 A.2d 233, 237 (R.I.1985) (noting that "[t]he government has a strong interest in protecting its employees from entanglements caused by dual positions *or even the appearance of such entanglements* ") (emphasis added). Just as the decisions of the board of elections "are subject, in some degree at least, to the revisory power of each house of the general assembly," *Opinion of the Justices*, 67 R.I. at 202, 21 A.2d at 270, so too are the decisions, activities, and enabling provisions of the various executive entities "subject, in some degree at least," to the Legislature's revisory powers. *Cf. In re House of Representatives (Special Prosecutor)*, 575 A.2d 176, 178–79 (R.I.1990) (opining that legislation empowering the Chief Justice to appoint a special prosecutor would violate the constitution's separation-of-powers mandate because it created the "potential for the Chief Justice to serve in dual capacities," thereby threatening the separate, institutional integrity of the Judiciary).

ized a radically different system than the one used in Great Britain, one in which—in contrast to such a parliamentary system—"[t]he leading feature of the constitution is the separation and distribution of the powers of the government," *Payne & Butler v. Providence Gas Co.*, 31 R.I. 295, 317, 77 A. 145, 154 (1910) (quoting Thomas M. Cooley, *A Treatise on the Constitutional Limitations*, 242 (Little, Brown, and Co. 7th ed.1903)). Indeed, this Court has characterized this distribution of powers in Rhode Island as nothing less than "the great principle of American liberty," *In re Judgment Against Dorr*, 3 R.I. 299, 301 (1854)—so great that "[t]he rights, the property, and the liberties of the people depend upon the due observance by each department of the constitutional limitations and restrictions upon its authority." *Id.* Thus, when the people of this state adopted its constitution in 1842, Rhode Island legally abandoned its former parliamentary system of government and instead committed itself to the tripartite system of separate and distributed government powers. This system had been flourishing in America for over fifty years, not only at the federal level but also throughout most of the other state governments. Under this system of government, the constitution's distribution and separate vesting of the state government's executive and judicial

functions removed these powers from the General Assembly—and thereby substantially diminished and restricted the General Assembly's previous "vast panoply of rights and powers"—in favor of bestowing these very powers upon the Governor (and upon the other executive officers) and upon the Judiciary, respectively. Unfortunately, my colleagues' zealous regard for the British system of parliamentary government has not been matched by a similar warmth for the American system of separated government powers that imbues our constitution. But no sudden outbreak of ebullient anglophilia, no gushing reverence for English lore and government, and no impassioned paeons to parliamentary supremacy can serve to overwhelm or outface this separation and distribution of powers in Rhode Island's constitution. Accordingly, acts and practices that may be ethical and legal under some other system of government (like the parliamentary one in Great Britain) that does not look upon the separation of governmental powers as "the great principle," *In re Judgment Against Dorr*, 3 R.I. at 301, and "indispensable safe-guard of republican liberty," *Mauran v. Smith*, 8 R.I. 192, 217 (1865), may be quite unethical and illegal under our system where that very principle serves as the cornerstone of our freedoms.

Accordingly, such global, prophylactic ethical restraints as those embodied in Regulation 5014 are designed so that public officials not only will avoid the appearance of impropriety and the conflict(s) of interest inherent in holding potentially incompatible public offices, but also will give their undivided loyalty to the duties of their principal elected or appointed office. *See Cranston Teachers Alliance*, 495 A.2d at 235–37 (upholding G.L.1956 § 17–1–5.1's dual-municipal-office-holding ban—to wit, that "no municipal employee may hold a municipal elective office in the city or town in which he or she is employed"—because a public employee's right to hold such an elective office "is outweighed by the government's interest in preventing a potential conflict of interest"). Thus, in my judgment, regulations like the commission's revolving-door ban (discussed below) and its prohibition on legislators participating in executive-department appointments (Regulation 5014) are all cut from the same ethical cloth.[11] Most significant-

ly, they are consonant with the existence in 1986 (and today) of other, similar ethical and legal restrictions that barred and continue to prohibit the Governor, legislators, judges, and other public officials from participating in various types of multiple-government-office holding.[12] In any event, such a regulation plainly qualifies as a "provision[ ] on conflicts of interest" and on "use of position" within the meaning of those phrases as they are set forth in the 1986 ethics amendment to our constitution.

### 3. The Reasoning of the Justices' 1993 Advisory Opinion Upholding the Validity of the Commission's Revolving–Door Regulations Shows Why the Commission Possesses the Power to Adopt this Regulation

In 1993, the Governor asked the Justices of this Court for their advisory opinions concerning whether the commission's so-called "revolving-door" regulations were

11. In support of the proposition that legislative appointments to executive entities do not create an inherent conflict of interest, it has been suggested that "any system of government * * * may be operated ethically * * * [or] in an unethical manner, depending upon the officials who may from time to time be placed in charge of the government." But why should the people of this state have to hope for benevolent despots if they can take steps to assure that the system of government they live under will not be so vulnerable and conducive to abuses of power? In any event, the people of Rhode Island empowered the commission—and not the Legislature or the Supreme Court—to decide what ethical restrictions should govern public officials' conduct. Thus, so long as these ethical restraints are not inconsistent with the constitution's other provisions and are rationally related to preventing conflicts of interest and misuse of public office, we as judges should not be substituting our judgment for the commission's and then *striking them down* based upon our own substantive views of what measures would or would not tend to promote an ethical state government. Moreover, based upon its constitutional authorization from the people of this state, the commission was entitled to believe that a meaningful ethics code should include something more than a mere exhortation for the people to select good pub-

lic officials and for these officials to do the right thing when they are placed in charge of the government. Thus, the issue we face is not whether legislative appointments to executive entities create an inherent conflict of interest. Rather, we must determine whether *the commission, pursuant to its constitutional power to promulgate an ethics code for public officials, was entitled to prescribe a rule designed to thwart—or at least to minimize—the potential for conflicts of interest and misuse of legislators' public offices that would otherwise exist if legislators were allowed to participate in executive-office holding.*

12. The parties' arguments largely have focused on the alleged diminution in the Legislature's appointment powers if we were to uphold Regulation 5014. But this regulation *also takes away the Governor's power to dangle high executive offices in front of key legislators in the hope of garnering influence or support for the Governor's favorite proposed legislation* or for some other requested quid pro quo emanating from the executive department. Thus, such a provision also serves as an anti-corruption measure to check unbridled executive power, a primary concern of colonial Americans when they framed our original state and federal Constitutions. *See* Wood, at 132–43.

constitutional. *See In re Advisory From the Governor*, 633 A.2d 664 (R.I.1993). There, one year after opining on the validity of the constitutional provisions creating the commission and authorizing it to adopt an ethics code, the Justices issued yet another unanimous advisory opinion in which they all concluded that the commission's revolving-door regulations were valid. Among the newly created restrictions that these revolving-door regulations imposed on legislators were provisions that flatly barred any member of the General Assembly from seeking or accepting state employment (not held at the time of the member's election) while the member was serving in the General Assembly and for a period of one year after leaving his or her legislative office. Regulation 36–14–5007 ("No member of the General Assembly shall seek or accept state employment as an employee or consultant, not held at the time of the member's election, while serving in the General Assembly and for a period of one (1) year after leaving legislative office.").

Although nominally directed at individual legislators, the revolving-door regulation also operated to deprive both the General Assembly and the Governor of whatever respective powers they may have enjoyed previously in appointing sitting legislators to various state-employment and consulting positions. In their 1993 advisory opinion, the Justices opined that this regulation was constitutional notwithstanding a multi-pronged attack upon its validity, including its alleged unlawful infringement upon the Legislature's (and the Governor's) historic appointment powers. Noting that this

regulation and its concomitant legislation [13] were designed to "ensure that public officials adhere to the highest standards of conduct, avoid the appearance of impropriety, and do not use their positions for private gain or advantage[,] *[s]ee* R.I. Const., art. 3, sec. 7," the Justices stated that such a ban on multiple-government-position holding by legislators and by other public officials was "an effective device by which the public trust may be enhanced." *In re Advisory From the Governor*, 633 A.2d at 671. "There is a legitimate purpose in abridging the abuse of public office. The drafters of [this regulation] could have reasonably concluded that *the possibility* of one's unjustly entrenching oneself in a public position, by moving from one state or municipal position to another, could be greatest for those positions to which [the ban on legislators accepting other government employment] was made applicable." *Id.* (Emphasis added.)

Thus, in 1993, the Justices (two of whom are also Justices of the present Court) unanimously believed that the commission was empowered to adopt a regulation that presumed and predetermined *a priori*—without any evidence of a violation and without providing a hearing—that every member of the General Assembly who had accepted or who would in the future accept state employment to serve at any public job or consulting position throughout the entire reaches of state government (save for jobs that they held when they were

---

**13.** The revolving-door regulations were "more narrow" than the legislation enacted by the General Assembly on this same subject matter. *In re Advisory From Governor*, 633 A.2d 664, 669 (R.I.1993). In other words, the regulations were more restrictive of legislators' ability to accept state-employment or consulting positions than the legislation addressing this same subject matter. As a result, the Justices opined that "[a]n individual could be found to have violated the regulations while being in compliance with the stat-

ute." *Id.* Moreover, after the 1986 ethics amendment to the constitution, the General Assembly is "limited to enacting laws that are not inconsistent with, or contradictory to, the code of ethics adopted by the commission." *In re Advisory Opinion to the Governor (Ethics Commission)* 612 A.2d 1, 14 (R.I.1992). Thus, the validity of the commission's revolving-door regulations had nothing to do with the existence of similar, consistent legislation addressing the same subject matter.

elected) was automatically guilty of a potential conflict of interest or abuse of position.[14]

Obviously, this same prophylactic reasoning that the Justices wholeheartedly embraced in 1993 to uphold the revolving-door ban applies with equal force to the commission's ban on legislators participating in appointments to executive entities. In their 1993 advisory opinion, the Justices unanimously characterized the commission's global, prophylactic ban on legislators contemporaneously holding, seeking, or obtaining any employment or consulting positions *throughout the entire state government* as among the "ethical restraints" that the commission had adopted validly pursuant to its constitutional mandate to do so. *In re Advisory From the Governor,* 633 A.2d at 671. Significantly, there was no talk then from the Justices about how the commission could not use its authority to promulgate an ethics code to alter the structure of government or to relegate offending legislators "to the category of status offenders." On the contrary, the Justices stated:

"The drafters [of the revolving-door regulation] may have concluded that the risk of undue influence is great in the positions that it identified. * * * No government branch is immune from 'influence peddling,' and *we believe that there was an adequate basis for the ethical restraints imposed.* * * * 'The [drafters are] certainly entitled to consider that "[e]vils in the * * * field may be of different dimensions and proportions" so that different remedies are required.' * * * The revolving-door [regulation] rests on a rational predicate and promotes integrity and public confidence in government." *Id.* (quoting *Forti v. New York State Ethics Commission,* 75 N.Y.2d 596, 555 N.Y.S.2d 235, 554 N.E.2d 876, 883 (1990)) (emphasis added).

By a parity of reasoning, we also should uphold the ethical restraint at issue here. First, it too constitutes a prophylactic ban on plural-government-office holding by legislators and their designees, albeit it applies *only* to appointed, executive positions rather than to *all* other government-employment or consulting positions, as was true in the case of the revolving-door ban. Second, Regulation 5014's ban lasts for an even more limited duration than the period involved in the revolving-door regulation because the commission's ban on legislators serving on executive entities and participating in appointments to such positions ends as soon as any legislator's

---

14. Although Regulation 36–14–5006 allowed the commission to approve of exceptions to the revolving-door ban upon a showing of substantial hardship to the affected government entity, this hardship exception only applied to appointments or elections of a government official to the very public body of which he or she is or was formerly a member; no such hardship exception could be obtained under this regulation for any other state-government employment or consulting positions. Moreover, the Justices' observations about the revolving-door ban not constituting a per se restriction occurred in the context of showing why such a regulation did not bar any individual office holder's access to the electoral ballot. Accordingly, their comments were not intended to show that the regulation did not constitute a per se restriction on legislators' holding other state-government employment. In any event, like the revolving-door ban, Regulation 5014's bar on legislators participating in executive-office holding is temporary, lasting only for so long as these individuals serve as legislators. Thus, Regulation 5014 no more constitutes a per se restriction on legislators than does the revolving-door ban, and the Justices' comments on that ethical restraint are equally applicable to Regulation 5014:

"The public positions to which [the regulation] applies are appointed positions * * *. They are not positions that are elected by the general electorate. Therefore, the voters' interest or influence is extremely diluted and attenuated at best. The unrestricted vote they cast is for the person or the body exercising the power to appoint or elect. The revolving-door [regulation] does not unfairly burden those with political opportunities or aspirations. * * * *We do not view the revolving-door [regulation] as per se restricting an individual's access to the electoral ballot since the general electorate has a de minimis impact on the person appointed or elected." In re Advisory From the Governor* 633 A.2d at 670 (emphasis added).

service ends rather than continuing for an additional year, as was true for the revolving-door regulation. Third, although the commission cannot assume or controvert powers that are central to the operation of either the executive department or the General Assembly, *see In re Advisory Opinion to the Governor (Ethics Commission)*, 612 A.2d 1 (R.I.1992), the regulation here, as was true for the revolving-door ban, "do[es] not deprive the Governor or the General Assembly or local officials of their power to make appointments. As we have stated, the de minimis restriction that is placed on the power to make appointments is temporary and is not seriously intrusive of either the executive or the legislative branch's power." *In re Advisory From the Governor*, 633 A.2d at 675–76.

Here too, the commission's restriction on state legislators participating in appointments to executive entities is de minimis, temporary, and not seriously intrusive upon either the Governor's or the Legislature's powers. First, it is de minimis because it relates only to executive entities that, by definition, were created to carry out and administer the laws that the Legislature enacts and that the state's chief executive is duty bound to execute faithfully.[15] Except to the extent that it expressly provides elsewhere for limited exceptions to its plenary distribution of the chief-executive power to the Governor and of the other executive powers to the other officers within the executive department, our constitution distributes all of the government's executive power to the executive department, art. 5, vests the chief-executive power with the Governor, art. 9, sec. 1, and charges him or her, and not the Legislature, with the responsibility to take care that the laws are faithfully executed,

art. 9, sec. 2. Thus, this regulation does not impinge upon any core legislative or law-making function and contravenes no other constitutional provision pertaining to the General Assembly. Second, it is temporary in the same sense as the revolving-door ban was so labeled because, like the revolving-door regulation, the ban on legislators serving in such executive capacities or participating in such appointments lasts only for so long as they are legislators—without even tacking on the additional one-year-waiting period applicable to the revolving-door ban. Finally, unlike the revolving-door ban which applied to *all* government-employment and consulting positions, the breadth of the ban on legislators participating in certain executive-department appointments is narrower, affecting positions in only one branch of government instead of in all three branches.

To be sure, unlike Regulation 5014, the commission limited the revolving-door regulation to a ban on multiple-government-position holding by legislators and by other public officials, and thus it did not extend to legislators *participating* in the appointment of others to state-government-employment and consulting positions. However, if, as the Justices opined in 1993, it is lawful for the commission to forbid legislators from appointing themselves or any of their fellow legislators to any state-government-employment or consulting positions, then I do not believe that it would be unlawful for the commission to preclude legislators from appointing their designees to such government jobs, let alone to just appointive positions within the executive department. In other words, the commission was entitled to conclude that the perceived evils of multiple-position holding by legislators simultaneously serving in exec-

---

**15.** For example, it has no effect whatsoever on any of the Legislature's constitutional appointive and/or elective powers. *See* R.I. Const. art. 4, secs. 3 and 4 (requiring the General Assembly to elect specified executive-department officers after an incumbent has become incapacitated or if there has been a failure to elect such an officer or whenever a vacancy occurs). Nor does it extend to advisory boards, to entities exercising legislative functions, or to other non-executive entities such as the commission itself. *See* Regulation 5014(2).

utive positions, coupled with the constitutional imperative for the Governor to serve as the state's sole chief executive and to execute the laws faithfully, should not be so easily evaded and/or compromised as by allowing legislators to appoint their surrogates to the very positions that they themselves are forbidden to hold.

In sum, if one accepts and agrees with the reasoning of the Justices in 1993, when they unanimously upheld the validity of the commission's broad revolving-door ethical restraint banning legislators (during their service as legislators and for one year thereafter) from accepting any appointments to state-government-employment and/or consulting positions—regardless of what branch of government such a position may be located—then it follows that a narrower ethical restraint barring legislators only from accepting or participating in appointments to executive entities while they are serving as legislators likewise is valid. Since two of the members of this Court have already opined in 1993 that the commission's revolving-door regulation was a valid "ethical restraint," [16]

both the logic of their reasoning and the interests of consistency argue in favor of a conclusion that the commission's executive-appointment regulation also is lawful.[17]

### 4. Upholding the Validity of this Regulation Would Not Result in the Commission Possessing a Virtually Limitless Power to Restructure Rhode Island's Government

Acknowledging the commission's power to adopt such ethics-code provisions as those challenged here does not mean that the commission's substantive power to adopt ethics regulations will allow the commission to "sit as a continuing constitutional convention in which capacity it would have the power to alter the structure of government to comport with its views." Nor will it convert the commission into "a paramount fourth branch of government" that is "limitless in its powers." With all due respect to my colleagues, this parade of baseless bogeymen only serves to demonize the commission by grossly overstating and distorting its limited constitu-

16. Displaying "the same Olympian disdain for our advisory opinions" that they accuse me of exhibiting, my colleagues who disagree now seek to blow off the above analysis as "flawed" and "wholly unsupportable." But their unqualified endorsement in 1993 of the commission's global, prophylactic ban on legislators simultaneously accepting any other government employment cannot be cashiered so conclusorily. Prosaically, they refrain from responding point-by-point to the contrary position set forth herein. But lack of colorful metaphor is no excuse for lack of legal analysis. On the contrary, their dismissive attempt to scrub the revolving-door opinion's reasoning off their hands simply does not wash. Nor does it square with the Court's rationale in *Cranston Teachers Alliance Local No. 1704 AFT v. Miele*, 495 A.2d 233 (R.I.1985), where we upheld a flat-out statutory ban on municipal employees holding elective office in the city or town where they are employed based upon the government's "strong interest in protecting its employees from entanglements caused by dual positions or even the appearance of such entanglements." *Id.* at 237. Has the state government's "strong interest" in protecting public office holders and employees from "even the

appearance of such [dual-position] entanglements" suddenly flown the coop? Finally, their charge that I have failed "to weigh the importance and significance of [the] limitations on the [revolving-door] ban" is belied by my detailed discussion of these limitations in this section of my opinion and of why these limitations—to the extent they exist at all—are generally applicable to Regulation 5014 as well.

17. I recognize, of course, that advisory opinions have no precedential value in the sense of stare decisis; that is, they lack the potentially controlling impact that decisions in previously litigated cases and controversies have upon later decided cases involving the same or similar factual situations. *See, e.g., Romeo v. Cranston Redevelopment Agency*, 105 R.I. 651, 656, 254 A.2d 426, 430 (1969); *see also G. & D. Taylor & Co. v. Place*, 4 R.I. 324, 362 (1856). Nonetheless, they should be afforded whatever respect and adherence is warranted by the strength and persuasiveness of their reasoning as applied to the pending legal question. *See Romeo v. Cranston Redevelopment Agency*, 105 R.I. 651, 254 A.2d 426 (1969).

tional power to enact ethics regulations for public officials.

First, the commission only may enact rules and regulations governing public ethics. *See In re Advisory Opinion to the Governor*, 612 A.2d at 19. Thus, it has no authority whatsoever to address other subjects, much less to operate as a continuing constitutional convention. Second, it is subject to many of the institutional checks and balances that serve to limit the powers of any administrative agency. *See id.* at 18 (pointing out that "the commission, like any other governmental body, is subject to many of the usual checks and balances associated with our tripartite form of government," including judicial review of the validity of any challenged regulations, compliance with the Administrative Procedure Act's provisions that are applicable to other government agencies, and the General Assembly's power, subject to the constitution's "independent non-partisan" mandate, to legislate the composition of the commission, to establish penalties for violations of commission regulations, and to appropriate funding for the commission to function).

Third, and most importantly, the commission cannot enact purported ethics-code regulations that would contradict other provisions in the constitution or that would invalidate or render illegal acts that other state or federal constitutional provisions require or expressly authorize. For example, under certain specified circumstances, the constitution requires legislators to participate in electing one or more of the executive department's general officers when an incumbent has become incapacitated, when there has been a failure to elect any one or more of these officers, or whenever a vacancy occurs in these offices. R.I. Const. art. 4, secs. 3 and 4.[18] Thus, the commission could not enact an ethics-code provision that would purport to bar legisla-

tors from participating in such elections because the commission deemed such activity to constitute a conflict of interest or a misuse of their legislative office. Similarly, the commission could not prevent the Governor from exercising his or her constitutional power to veto legislation on the grounds that the mere exercise of such a veto power would constitute a misuse of that office. Such a regulation would be contra legem because it would contradict one or more separate provisions of the constitution that expressly authorize such acts, and therefore, it would "set standards that seriously impinge upon the executive or the legislative branch's ability to perform the usual or ordinary duties for which each is elected, including the appointment of various officials to public office." *In re Advisory Opinion to the Governor*, 612 A.2d at 19.

In other words, any ethics-code provisions adopted by the commission cannot render conduct illegal that the constitution itself otherwise authorizes or compels. However, if such acts merely would have been constitutionally permissible in the absence of a contrary ethics regulation—but were not required or expressly authorized by some other constitutional provision—then the commission certainly may adopt ethics-code regulations that outlaw such behavior if by doing so it would tend to minimize governmental conflicts of interest and/or the misuse of a public official's position for some improper purpose. Thus, in the case of the revolving-door regulation, before the commission adopted such an ethics restraint, the constitution may well have permitted state legislators to hold one or more employment and/or consulting positions in state government while still serving as legislators. In any event, from time to time, the General Assembly and/or the Governor certainly have appointed leg-

---

18: Although it is true that the General Assembly "holds the purse, and, under our constitution, appoints as well as pays," *G. & D. Taylor & Co.*, 4 R.I. at 354, the Legislature's express appointive powers presently are quite limited under the constitution and are prohibited to the extent that the exercise of such a power would constitute an executive-department function or frustrate the Governor's exercise of the chief-executive power, *see infra* part II.

islators to such positions as if they were entitled to do so. Nonetheless, the members of this Court did not deem the commission's revolving-door regulation barring such multiple-position holding to be invalid merely because it altered the then-existing structure of government which allowed legislators to serve in such dual capacities or because the General Assembly's "heretofore exercised" powers, as vouchsafed to it under article 6, section 10, of the constitution, meant that the commission could not prohibit such conduct. In short, the bottom line legally—then and now—is that "[h]istorical anecdotal occurrences [concerning the General Assembly's past powers and practices] cannot overcome a clear and unambiguous grant of constitutional power" to another constitutional actor, *In re Advisory Opinion to the Governor*, 688 A.2d at 291, a grant that, in this case, plainly authorizes the commission to adopt such provisions.

In 1986, the people of Rhode Island gave the commission "a clear and unambiguous grant of constitutional power" to enact ethics regulations "on" conflicts of interest and misuse of office by legislators and other public officials. Indisputably, Regulation 5014 is "on" these subjects. Thus, even if the opponents of this regulation could establish the existence of a long and incontrovertible record of "[h]istorical anecdotal occurrences" documenting past legislative participation in appointments to executive positions, they cannot rely upon such historical evidence to trump Rhode Islanders' "clear and unambiguous grant of constitutional power" to the commission in 1986 to enact ethics-code regulations that would outlaw such occurrences in the future.[19] By vesting the commission with the power to enact substantive ethics-code provisions, the people of Rhode Island necessarily prohibited the General Assembly from continuing to exercise whatever unenumerated but "heretofore exercised" powers and practices it may have enjoyed previously that would now be inconsistent with any duly enacted ethics-code provisions that the commission chose to adopt on conflicts of interest and misuse of office. *Accord In re Advisory Opinion to the Governor*, 612 A.2d at 14 (holding that after the passage of the ethics amendment in 1986, the General Assembly is "limited to enacting laws that are not inconsistent with, or contradictory to, the code of ethics adopted by the commission").

Moreover, the mere fact that one can point to a "history" of something does not make that something lawful. One need not agree with Voltaire, who once said that "history is but a tableau of every crime and catastrophe," *L'Ingenu, in* Candide and Other Stories 189, 221 (Roger Pearson ed.1992), or with the great historian of the Roman Empire, Edward Gibbon, who believed that history "is, indeed, little more than the register of the crimes, follies, and misfortunes of mankind," Edward Gibbon, 1 *The Decline and Fall of the Roman Empire* 69 (1959), to acknowledge that the fact that some activity or practice has a history is hardly any guaranty of its propriety or legality. *See, e.g., In re Advisory Opinion (Chief Justice)*, 507 A.2d 1316, 1323 (R.I.1986) (opining that, notwithstanding the 1935 "Bloodless Revolution" whereby the General Assembly removed all five Supreme Court Justices by a joint resolution declaring their seats vacant, the General Assembly's power to do so had "ceased to exist" as early as 1854, when the annual session to exercise such a power was eliminated, and "[c]onsequently, that event does not serve as a persuasive

---

**19.** A fortiori, the General Assembly's historical participation in judicial appointments can be relied upon to undercut the constitution's prohibition of the General Assembly's exercise of *executive* powers. Judicial officers do not serve in executive positions, nor are they subject to the Governor's chief-executive power. Thus, the power of judicial appointment need not be and has not been an exclusive executive function, and, in any event, the power of judicial appointment is not implicated by Regulation 5014 or by any of the other questions that are before us. Thus, with respect to answering the questions posed to us, the General Assembly's past participation in judicial appointments is a red herring.

precedent either historically or legally"). One could just as easily proclaim that Rhode Island has had a history of racial, gender, and ethnic discrimination; of recurring government corruption; and of allowing personal conflicts of interest to supersede the public's interest as that its history is one of parliamentary supremacy. But none of these statements tells us one thing that would assure us of the lawfulness of this history, let alone of its desirability. Rather, to decide the questions before us properly, we must transcend "[t]he horrid tale of perjury and strife, [m]urder and spoil, which men call history," William Cullen Bryant, *Earth, in* Poetical Works of William Cullen Bryant 163 (1882), and address the legality of the conduct in question.[20] Accordingly, notwithstanding the General Assembly's periodic historic failure to observe the constitutional limitations upon its powers, *see, e.g., G. & D. Taylor & Co. v. Place,* 4 R.I. 324 (1856) (striking down as unconstitutional the General Assembly's attempt to exercise its former judicial powers), it is nonetheless the rule of law that in the end must prove triumphant if the public interest is to prevail over the mere will of those who would defy the constitution to achieve their ends.

Significantly, nothing in the constitution—either before or after the 1986 ethics amendment—authorizes or requires legislators to participate in the executive-department appointments covered by this regulation, much less to accept appointments to such positions. Indeed, to the extent that such participation would interfere or conflict with the Governor's chief-executive powers, and in particular, with his or her constitutional duty to "take care that the laws be faithfully executed," R.I. Const. art. 9, sec. 2, the constitution's separation and distribution of powers would bar such participation in any event. *See infra* part II. Thus, this is not a situation where the commission has attempted to restructure state government by altering what the constitution otherwise mandates. Indeed, far from altering the structure of government provided for in our constitution, Regulation 5014 conforms the structure of state government to what our constitution compels in this respect. Art. 9, secs. 1 and 2.

After the people amended the constitution in 1986 to endow the commission with the authority to adopt regulations that prohibit unethical conduct by public officials, it can scarcely be deemed a restriction on the commission's power to outlaw

**20.** Bowing and scraping before their makeshift shrine to a pre-constitutional Legislature wielding a "vast panoply of rights and powers," some opponents of Regulation 5014 are so busy kindling burnt offerings to this extinct idol from a bygone, charter-ruled Rhode Island that they dare not look up even for a moment to acknowledge that the constitution not only has redistributed the state government's executive and judicial powers away from the General Assembly, but it also has bestowed such powers concomitantly upon the executive and judicial departments, respectively. (My colleagues grudgingly concede that Rhode Island's "parliamentary system was modified in 1843" when the constitution became effective. But this is like saying that Anne Boleyn's nervous system was modified in 1536 after King Henry VIII's executioner concluded his official business with her). More recently, the people of Rhode Island divested the General Assembly of its ultimate power to legislate vis-à-vis public ethics. All of these changes have diminished substantially the Legislature's pre-constitutional authority in these critical areas of state government. Thus, the time has long since passed for us to stop chanting an atavistic mantra to the General Assembly's "vast panoply of rights and powers" under Rhode Island's pre-constitutional charter government and to start focusing on the text of the current constitution and on the vast panoply of federal and state constitutional limitations that presently curb the legislative department in the exercise of its powers. In particular, as applied to the questions before us, we need to ask ourselves what it means for the Governor to be vested with the state's chief-executive power, for the General Assembly to be denuded of its pre-constitutional power to execute the laws of this state, and for the commission to be empowered to enact an ethics code for legislators and other public officials that the Legislature is powerless to contradict. *See In re Advisory Opinion to the Governor,* 612 A.2d at 14.

future legislative participation in executive-department appointments that the constitution previously did not forbid such participation in express terms and that legislators in fact participated in many such appointments. Otherwise, the commission would be powerless to enact any meaningful ethics-code provisions if it could only proscribe for the future what the constitution already had prohibited in the past. Because such an interpretation effectively would disable the commission from implementing its constitutional duty to adopt an ethics code for Rhode Island's public officials, I reject it as a facially unreasonable construction of what the commission has been authorized to do under the 1986 ethics amendment to the constitution.

### 5. The Opinions of One or More So-called Ethics Experts Concerning the Constitutional Validity of Regulation 5014 Should Have No Bearing on Our Responses to the Governor's Questions

Opponents of Regulation 5014 seek to make much of the fact that one or more so-called ethics experts advised the commission that it lacked the authority to promulgate this regulation. They even have suggested that the commission's own executive director shared with the commission his personal doubts about the regulation's validity. With all due respect to the individuals who may have expressed such opinions, their advice to the commission should be of little moment to our resolution of the constitutional issues presented in the Governor's requests to us.

First of all, in the past, we have not decided constitutional questions by adverting to the opinions of so-called experts hired by one side or another to a litigated controversy so that they can guide us concerning how we should rule on a particular constitutional matter that is before us. Nor would it be a salutary practice for the members of this Court to do so now, no matter how delphic or lucid such expert oracles may seem to be in this or in any other given case. Second, the ethics experts in question have no particular expertise to offer us on the key constitutional issue that we are facing: namely, whether, as a matter of Rhode Island constitutional law, Regulation 5014 is consistent with the power given to the commission in 1986 to adopt an ethics code containing provisions on conflicts of interest and misuse of office by Rhode Island public officials. Although the ethical regulation of public officials is obviously the subject matter of the regulation, the commission's power to promulgate such a rule is primarily a question of Rhode Island constitutional law rather than one involving the parsing of some ethical conundrum.[21]

Thus, a parade of twenty ethics experts telling us or the commission that the regulation is or is not constitutional, together with a signed, sealed, and sworn opinion from the commission's executive director advising us (or the commission) of his opinion on this subject should have no more weight than the force of their respective constitutional arguments otherwise would merit. In any event, we are not in the business of resolving constitutional issues by resorting to some sort of self-serving expert weathervane proffered by one party or another to measure which way the gusts of informed opinion are blowing. We are not polltakers or followers, nor should we render our advisory opinions only after holding up a wet finger to the prevailing winds of public or expert opinion. Accordingly, the mere existence of one or more

21. Thus, notwithstanding my colleagues' apotheosis of a legal-ethics professor, Geoffrey C. Hazard, and without in any way impugning his impeccable credentials in the field of legal ethics, his expertise in Rhode Island constitutional law appears to be comparatively thin, if not entirely nonexistent. Moreover, his written opinion on the constitutionality of Regulation 5014 was decidedly short on the requisite constitutional analysis; was largely bereft of citations to applicable, if not controlling, legal authorities; and therefore, was singularly unpersuasive on a subject that is not within his primary field of expertise.

such opinions—pro or con—should have no bearing on the advice that we give to the Governor or on our resolution of the legal questions which he has asked us to answer.

### 6. The Challenged Regulation Is Similar to Bans on Public Officials' Participation in Multiple–Position Holding that Existed in Other Ethical Provisions When the Ethics Amendment Was Adopted

"In construing a constitutional provision, this court properly consults extrinsic sources * * *. * * * [I]n our examination of the constitution, we must look to the history of the times and examine the state of affairs as they existed when the constitution was framed and adopted." *Sundlun*, 662 A.2d at 45. When the people of Rhode Island adopted the ethics amendment to the constitution in 1986, other ethics provisions existed that contained language barring similar types of participation by public employees in multiple-office holding. For example, the then-existing Canons of Judicial Ethics—which were "adopted [in 1971] in order to provide the judges of the several courts of the state with a proper guide and reminder of the principles which should govern their personal practices in the administration of their offices," Preamble to Canons of Judi-

cial Ethics—barred judges in Rhode Island from serving in various non-judicial positions, *see* Canons 24A and 28 (barring judges from serving as executors, administrators, personal representatives, guardians, attorneys in fact, or other fiduciaries). The Canons of Judicial Ethics also barred Rhode Island judges from acting as arbitrators or mediators, and from accepting appointments "to a governmental committee, commission, or other position that is concerned with issues of fact or policy." Canons 24B and 24C.[22] Accordingly, in 1986, when the framers proposed and the people of Rhode Island adopted a new constitution authorizing the commission to adopt an ethics code containing conflict-of-interest and misuse-of-position regulations, the then-existing Canons of Judicial Ethics included prophylactic restrictions on multiple-position holding by judges—provisions that, like Regulation 5014, barred these public officials from accepting appointments to other government and private positions, and from otherwise participating in certain multiple-position-holding activities. Despite the fact that the then-existing constitution and statutory law did not expressly preclude such multiple-position holding by judges, this Court adopted these ethical restrictions pursuant to its unquestionable legal authority to do so.

---

**22.** he only exception allowed to the ban on judges accepting multiple appointments to other governmental positions was for matters involving "improvement of the law, the legal system, or the administration of justice." Canons of Judicial Ethics, Canon 24C. Presently, the Code of Judicial Conduct bars judicial participation in appointments to be made by other departments of government because it provides that *"[a] Judge shall not* appear at a public hearing before, or *otherwise consult with, an executive or legislative body or official* except on matters concerning the law, the legal system or the administration of justice or except when acting pro se." Art. VI, Canon 4C(1) (emphasis added). The Rules of Professional Conduct governing the practice of law in Rhode Island offer a useful comparison in the non-public-official context. In particular, Rule 1.7 provides that an attorney may not represent the interests of two or more clients in a particular action where those interests may conflict (save for the attorney's reasonable belief that such a conflict will not occur and after obtaining the clients' consent to do so). Sup.Ct. R. Prof 1. Conduct 1.7 ("A lawyer shall not represent a client if the representation of that client will be directly adverse to another client * * * [or] representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests * * *."); *see also* Rule 1.8 (prohibiting an attorney from entering into a business transaction with or acquiring an ownership, possessory, security, or other pecuniary interest which may conflict with that of a client's, subject to certain, well-defined exceptions); Rule 1.9 (prohibiting an attorney from acting in such a way as to cause a conflict of interest with a former client).

In addition to the Canons of Judicial Ethics, the federal Constitution itself always has contained so-called Ineligibility and Incompatibility Clauses that bar federal legislators from simultaneously holding any other federal office or position.[23] Indeed, the federal Incompatibility Clause has been dubbed "America's constitutional ethics rule." Steven G. Calabresi & Joan L. Larsen, *One Person, One Office: Separation of Powers or Separation of Personnel?*, 79 Cornell L.Rev. 1045, 1119 (1994) (hereinafter *One Person, One Office* ).

> "The Framers must have known that the ability of a single person to hold a multitude of lucrative offices, whose duties he could not possibly perform, had contributed to the disastrous inefficiencies of both the British and state colonial governments. Thus, *the Framers sought to create a government in which 'one person, one office' would be the constitutionally prescribed norm. This norm eliminates severe ethical conflicts of interest when individuals hold two jobs simultaneously. For precisely this reason, many state governments expressly bar dual office holding in their state constitutions. Moreover, at the center of our ethics laws lies a prohibition against holding many public and private jobs simultaneously. This bar, too, has been with us for most of our history.* Accordingly, it should come as no surprise today that, for the most part, *our national government now conforms quite strictly to the one person, one office ideal.*" *Id.* at 1115–16 (emphases added).

Thus, an ethical restriction barring public officials from participating in multiple-office holding is not some new, crazy idea hatched by the commission and embodied in the form of Regulation 5014. On the contrary, from the very founding of this country, colonial Americans resented the "piling of 'a multiplicity of posts upon one man,' offices that were obviously only a source of wealth and could never be properly exercised, [and] were eager to prevent 'any one man—family—or their connections, from engrossing many places of honor and profit.'" Gordon S. Wood, *The Creation of the American Republic 1776–1787*, 156 (1969) (hereinafter Wood). Indeed, "with the exceptions of New York and South Carolina, all the state constitutions provided for strict incompatibility between service in the legislative and executive departments as an added precaution against executive manipulation of the legislature." *One Person, One Office*, 79 Cornell L.Rev. at 1058–59. "Such unqualified debarring of the magisterial presence from their legislatures represented for Americans in 1776 the fruits of their knowledge of political science and one of their great achievements in building truly free governments." Wood, at 158–59. Moreover, "[p]lural officeholding, an appointing prerogative * * * was prohibited in various degrees in every state constitution in place in 1787."[24] Theodore Y. Blumoff, *Separation of Powers and the Origins of the Appointment Clause*, 37 Syracuse L.Rev. 1037, 1052–53 & n. 82 (1987).

Accordingly, when Rhode Islanders voted in 1986 to empower the commission to

---

**23.** The federal Ineligibility and Incompatibility Clauses of the United States Constitution provide as follows:

"No senator or representative shall, during the time for which he was elected, be appointed to any civil office under the authority of the United States, which shall have been created, or the emoluments whereof shall have been increased during such time; and no person holding any office under the United States, shall be a member of either house during his continuance in office." U.S. Const. Art. I, sec. 6.

**24.** Del. Const. of 1776, art. XVIII; Ga. Const. of 1777, arts. XVII, XVIII; Md. Declaration of Rights of 1776, art. XXX; Md. Const. of 1776, art. XXXVII; Mass. Const. of 1780, ch. VI, art. II, pt. 2; N.H. Const. of 1784, pt. 2; N.J. Const. of 1776, art. XX; N.Y. Const. of 1777, art. XXV; N.C. Const. of 1776, arts. XXVI–XXX, XXXV; Pa. Const. of 1776, §§ 19, 23; S.C. Const. of 1778, arts. IV, VII, XX; Vt. Const. of 1785, ch. II, §§ XXIII, XXVII; Va. Const. of 1776, art. XIV.

adopt a code of ethics that would include provisions like Regulation 5014, similar ethical restraints also abounded in the federal Constitution, in state constitutions, in statutes, in judicial decisions, and in other then-existing ethics codes. For example: "of the forty states that now have a general separation-of-powers clause or provision in their state constitutions, eleven provide only that the powers of one branch of the government may not be exercised by either of the other branches, while the other twenty-nine also prevent individuals from exercising the power of more than one branch at the same time. *The rule of one person, one office is here to stay at the level of state constitutional law. America has progressed from a separation of powers to a separation of institutions to a separation of personnel.*" One Person, One Office, 79 Cornell L.Rev. at 1155 (emphasis added).

Article 3, section 6, of our state constitution provides yet another example of an ethics provision barring multiple-office holding.[25] This clause has long precluded any person who holds an office under the government of the United States or of any other state or country from also acting as a general officer of the State of Rhode Island or as a member of the General Assembly. This Court has held (and members of this Court previously have opined) that the framers designed this anti-conflict-of-interest section in our constitution to secure the undivided loyalty of the state officials who come under its provisions. *See Davis v. Hawksley*, 119 R.I. 453, 379 A.2d 922 (1977); *Opinion to the Governor*, 83 R.I. 370, 116 A.2d 474 (1955). Hence, it too constitutes a prophylactic ban on multiple-government-office holding (between

federal and state offices) that plainly qualifies as a provision "on" conflicts of interest and misuse of position. Indeed, as the Canons of Judicial Ethics and the Justices' 1993 Advisory Opinion on the commission's revolving-door ban make clear, there is no reason in law or logic why such ethical provisions, to be valid, must be included in a constitution or in a statute rather than in a duly enacted code of ethics that is authorized to include provisions on conflicts of interest and misuse of public positions. Thus, far from having "historically eschewed prophylactic bans" on plural-government-office holding, this Court repeatedly has approved of such restrictions when they arise in the context of legal or ethical regulations like this one. *See, e.g., Cranston Teachers Alliance Local No. 1704 AFT v. Miele*, 495 A.2d 233 (R.I. 1985).

Indeed, when surveying the extensive menu of various ethical restraints that states have imposed on public officials and employees via constitutional provisions, statutory enactments, judicial decisions, and ethical codes, bans on participation in multiple-office-holding activity have been and continue to represent a meat-and-potatoes staple of such fare. As a result, "at least seventeen states disallow some forms of dual service in more than one position within the executive department of a state's government, and at least twenty states specifically preclude the Governor from simultaneously holding another executive office within that state's government. At least nineteen states forbid the dual holding of state and local governmental offices, and twenty-eight states forbid judges from practicing law." *One Person,*

---

**25.** Article 3, section 6, of the Rhode Island Constitution provides:
 "No person holding any office under the government of the United States, or of any other state or country, shall act as a general officer or as a member of the general assembly, unless at the time of taking such engagement that person shall have resigned the office under such government; and if any general officer, senator, representative,

or judge shall, after election and engagement, accept any appointment under any other government, the office under this shall be immediately vacated; but this restriction shall not apply to any person appointed to take depositions or acknowledgment of deeds, or other legal instruments, by the authority of any other state or country."

*One Office,* 79 Cornell L.Rev. at 1154. In addition, "forty-six out of fifty states now provide for a substantial measure of judicial-executive incompatibility in their state constitutions." *Id.* at 1139. "Twenty-eight states go even further with the one person, one office principle and extend it to private sector 'offices' by explicitly forbidding judges from practicing law. Accordingly, there is an important sense in which one person, one office judicial-executive incompatibility is now firmly a part of America's unwritten constitutional tradition." *Id.* at 1139–40. Moreover:

> "a rule of one person, one office federal-state incompatibility is virtually mandated in most instances by state *constitutional law.* Thus, forty-seven out of fifty states have clauses in their state constitutions rendering individuals holding federal office ineligible to serve in their state legislatures. At least twenty-six states forbid persons to serve in the executive department of the federal government while serving in some offices of the executive department of their state government. At least twenty states specifically preclude their Governor from simultaneously serving in the federal executive department. And, forty-one states forbid members of their state judiciaries from holding office in the federal government." *Id.* at 1151–52 (emphasis in original).

Further, given how often, how widespread, and how long states have used this particular type of ethical restraint to curb governmental conflicts of interest and misuse of public positions, it can be said with supreme confidence that after surveying the universe of possible ethical restraints that have been imposed on public officials and employees, perhaps none is so familiar, so used, so ubiquitous, and so characteristic of such regulations as are those that typically involve some type of ban on public officials participating in multiple-office holding, of which the ban at issue here is a garden-variety example. In all of these instances, "the Incompati-

bility Principle forbids government officers from trying to serve two masters at the same time. The rule is: Whatever your constituency, electoral or otherwise, serve it and it alone, while renouncing all others." *Id.* at 1155–56. Thus, of all the potential provisions that a code of ethics for public officials and employees might include, perhaps none is less surprising or more expected than a bar of one sort or another on the participation in appointments to offices other than one's own. Indeed, it would appear that this type of prophylactic ban on multiple-office holding, like the federal Incompatibility Clause, has long functioned as the paradigmatic type of ethical restraint, one that framers of state and federal Constitutions, statutes, judicial decisions, and ethical codes alike have predictably resorted to time and time again when establishing what conduct is and is not ethically permissible for public officials. "The Framers wrote an ethics-rule Incompatibility Clause into the [federal] Constitution with the purpose of stopping corruption, and they ended up foreclosing the emergence of parliamentary government in America, leaving us instead with the congressional committee system." *Id.* at 1157. As a result, "[t]oday, the Incompatibility Clause, and the principle it embodies, seems to be the cornerstone of the entire American constitutional structure." *Id.* Accordingly, the commission has adopted what can be safely called a quintessential ethics-code provision, one that is designed to nip legislators' conflicts of interest in the bud and to halt at the governmental get-go any misuse of their public positions for private gain and advancement before they have any chance to ripen into reality.

To accept the opponents' argument that Regulation 5014 does not constitute a provision on ethics at all, but is really an impermissible attempt at the restructuring of Rhode Island government, would be to cut the heart and soul out of such ethics provisions as have been adopted here in Rhode Island and all over the country. And even if one could accurately charac-

terize Regulation 5014 as an attempt to restructure Rhode Island government via a reformation of public officials' ethics, it would appear that such a restructuring is exactly what the framers of the 1986 ethics amendment intended, and precisely what the people of Rhode Island wanted and expected when they empowered the commission to adopt regulations governing legislators' and other public officials' conflicts of interest and misuse of their positions.[26]

Thus, when the people of Rhode Island adopted the framers' proposal to empower the commission with the legislative authority to adopt an ethics code, including provisions on legislators' conflicts of interest and misuse of their positions, we must consider them to have appreciated the fact that such provisions likely would restrict legislators and other public officials from participating in certain much-reviled past practices and activities, such as revolving-door employment and multiple-office holding, that tended to expose them to conflicts of interest and to other opportunities for misuse of their public offices for improper purposes. Rhode Islanders in 1986 knew this to be so because other extant rules and regulations governing the conduct of public officials throughout the country—including federal and state constitutional provisions, the Canons of Judicial Ethics, Rhode Island statutory law, judicial decisions, and other ethical codes pertaining to public officials—also contained similar, global-prophylactic bans on public officials' holding of multiple-government positions. Hence, we should deem the people to have empowered the commission to preclude such officials from engaging in certain types of multiple-office holding and from otherwise participating in extra-department appointments to other government positions because such activities would tend to result in at least the appearance of impropriety, if not outright conflicts of interest and misuse of their public positions for improper purposes.

Moreover, the framers of the ethics amendment to the constitution did not believe that the commission should have to wait until it could catch one or more legislative foxes with the chief executive's feathers sticking out of their mouths before they could accuse them of a conflict of interest. Rather, the framers believed that, to avoid the appearance of impropriety, the commission should be able to promulgate regulations that would keep legislators out of the executive hen house altogether.[27] Accordingly, they "direct[ed]

---

**26.** As the Justices of this Court observed in 1992:

> "The years preceding the 1986 constitutional convention [when the ethics amendment to our present constitution was framed and later adopted] were marked by scandal and corruption at all levels of [Rhode Island's] government. Indeed, widespread breaches of trust, cronyism, impropriety, and other violations of ethical standards decimated the public's trust in government. Many articles appeared in both national and international news periodicals documenting the governmental crisis that the state faced. * * * [T]he public perception was that [Rhode Island's] government lacked the ability to control ethical conduct among its own members.
>
> " * * *
>
> "[C]ommittee members [were aware] of the rampant corruption and unethical conduct that had been plaguing the state in preceding years.

> "If the foregoing demonstrates anything at all, it is that the public did not trust [Rhode Island's] government and its leaders. Its lack of trust was clearly expressed through the public's representative delegates both during the ethics-committee deliberations and before the entire convention body. Such comments make it undeniably clear that the basic motivating factor in enacting the ethics amendment was to restore the public's trust in [Rhode Island's] government, which, as demonstrated, the framers and the electorate believed could only be accomplished by bestowing the power to legislate substantive ethics laws upon an independent non-partisan ethics commission subject only to judicial review." *In re Advisory Opinion to the Governor,* 612 A.2d at 11–12.

**27.** Thomas Jefferson expressed a similar point of view: "The time to guard against corruption and tyranny, is before they shall have gotten hold on us. It is better to keep the wolf out of the fold, than to trust to drawing

that a code of ethics be developed. * * * [To] put the responsibility on the [commission] instead of on the state legislature. Now that takes the fox away from the chickens." Constitutional Convention Committee on Ethics at 59–60 (May 22, 1986) (remarks of Delegate Milette). Furthermore, the people of Rhode Island approved the constitutional amendment that empowered the commission to do so.

For these reasons, even if the regulation's opponents, let alone myself and the other members of this Court, were all of the opinion that such a scheme is unwise, that it gives the commission too much power, that it restructures what heretofore had been one of the peculiar hallmarks of Rhode Island government (namely, legislative participation in executive-department functions), that it contains insufficient checks and balances against the commission's authority to adopt ethics rules, and that it contravenes the way in which Rhode Island legislators long have been allowed to operate throughout their entire pre-regulation history, none of these objections and/or reservations would entitle us to opine that Regulation 5014 was invalid in the teeth of the constitution's clear and unambiguous language empowering the commission in 1986 to adopt such ethical restraints. As the constitution itself states, " 'the basis of our political systems is the right of the people to make and *alter* their constitutions of government; but that *the constitution which at any time exists, till changed by an explicit and authentic act of the whole people, is sacredly obligatory upon all.*' " R.I. Const. art. 1, sec. 1 (emphases added). Thus, especially in light of the opponents' weighty burden to convince us beyond a reasonable doubt that this regulation is "palpably and unmistakably * * * an excess of legislative power," *Sundlun,* 662 A.2d at 44–45, I conclude that the opponents have failed to carry their heavy legal load, that therefore

the regulation in question is valid, and that its substance falls well within the authority granted to the commission under the 1986 ethics amendment to the constitution to adopt an ethics code for Rhode Island's public officials.

## II

### Separation of Powers and Legislative Participation in Appointments to Executive Boards, Commissions, Agencies, and Authorities

The Governor also has requested our written advisory opinions with respect to two additional questions. These requests relate to our interpretation of the constitution's provisions regarding the distribution and vesting of the various government powers vis-a-vis appointments to public bodies "within the executive branch of state government" and to other executive entities.[28] Having answered the Governor's first question in the affirmative, it usually would be unnecessary to reach the constitutional issues raised by questions two and three. This is so because if the commission possesses the constitutional authority to adopt Regulation 5014, which bars legislative participation in appointments to various executive positions, then questions two and three are moot, and providing answers thereto would constitute a mere academic exercise that would not, as a practical matter, assist the Governor in performing his constitutional responsibilities. *See Advisory Opinion to the Governor,* 110 R.I. 1, 5, 289 A.2d 430, 433 (1972) (noting that the members of this Court should issue an advisory opinion to the Governor if and only if the certified questions bear upon a constitutional duty of that office presently awaiting performance). However, because the other members of this Court have reached a contrary conclusion concerning the commission's power to adopt Regulation 5014,

his teeth and talons after he shall have entered." Thomas Jefferson, *Notes on the State of Virginia, in* Writings 123, 246 (1984).

**28.** For the specific text of these questions, see *supra* note 1.

I believe that it is necessary to respond to questions two and three for the same reasons that I gave earlier concerning why we should answer the Governor's queries.

The short answer that I reach in responding to these latter two questions is that, even if the Court were to determine that the commission had exceeded its powers in adopting Regulation 5014, questions two and three still should be answered in the affirmative, except that I do not believe that the constitution invariably prohibits any appointment of a sitting legislator (or a legislative designee) to each and every public board or body regardless of its executive character. Unlike the federal Constitution, our constitution does not contain a general appointments clause [29] giving either the Governor or the General Assembly the general power to appoint government officials.[30] Nonetheless, and most significantly for the purpose of answering the Governor's second and third questions, Rhode Island looks to federal jurisprudence "as providing an appropriate analytical framework for determining the extent of executive power." *Chang v. University of Rhode Island*, 118 R.I. 631, 638, 375 A.2d 925, 928–29 (1977). That federal jurisprudence, when joined with our own and with that of the other states, enables us to answer the questions presented.

Although the constitution provides for both the Governor and the General Assembly to participate in specific appointments or in elections of particular government officers under specified circumstances, *e.g.*, R.I. Const. art. 9, sec. 5;[31] art. 4, sec. 4,[32] it is silent with respect to fixing the locus of any general power to appoint persons to serve on executive entities. Moreover, except for its express delegation of legislative power to the commission to adopt an ethics code for public officials "on" "conflicts of interest" and "use of position," the constitution, unlike its federal counterpart, contains no Incompatibility or Ineligibility Clauses that would flatly prohibit legislators from holding other state-government offices or from otherwise participating in such appointments. Thus, apart from a valid ethics restraint precluding such activity, the ability of legislators to serve in these executive positions or to participate in the appointment of such officials turns on (1) the nature and function of the particular offices in question and (2) whether any limitations barring such service or restricting legislative participation in appointments to executive positions arise

29. Article II, section 2, clause 2, of the United States Constitution provides as follows:

"[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

30. Article 8, section 3, of the original constitution contained a clause authorizing members of the General Assembly, at its annual May session, "to join in grand committee, for the purpose of * * * electing other officers." The constitution, however, was silent concerning whether these "other officers" included executive-department officials. In any event, the General Assembly repealed the "other officers" clause in 1900 after a consti-

tutional amendment had abolished the May session of the Legislature, *see Election of Officers by the Senate*, 28 R.I. 607, 609–11, 69 A. 555, 556–57 (1908), thereby ending whatever general power the Legislature's grand committee once may have possessed to elect such "other officers."

31. Article 9, section 5, "Authority to fill vacancies," provides:

"The governor may fill vacancies in office not otherwise provided for by this Constitution or by law, until the same shall be filled by the general assembly, or by the people."

32. Article 4, section 4, "Temporary appointment to fill vacancies in office of secretary of state, attorney-general, or general treasurer," provides:

"In case of a vacancy in the office of secretary of state, attorney-general, or general treasurer from any cause, the general assembly in grand committee shall elect some person to fill the * * *."

from other constitutional or legal provisions that relate to these offices and to this aspect of the appointment power.

With respect to the first factor (the nature and function of the offices in question), the Governor's questions assume that the offices and entities at issue (memberships on various governmental boards, commissions, agencies, and authorities) are executive in their nature, function, and purpose. But whether such offices and entities are in fact executive may depend, at least in some measure, on the specific and varied responsibilities and duties of the particular offices and entities in question, together with an analysis of their powers and enabling legislation. However, for the purpose of responding to the Governor's questions here, I shall assume that all of the offices at issue are indeed executive in their nature, function, or purpose; that is, they involve activity that executes, administers, or implements legislation enacted by the General Assembly and that the entity is otherwise properly subject to chief-executive control.

With respect to the second factor, the text of the constitution does not expressly address the subject of appointments to executive entities, but it does contain restrictions and limitations on the General Assembly's powers that bear on how the Governor's questions should be answered. First, article 5 of the constitution distributes the powers of our state government among the executive, legislative, and judicial departments,[33] with the result that "[e]ach [department] is vested with exclusive power in its appropriate sphere." *In re Judgment Against Dorr*, 3 R.I. 299, 300 (1854). The very purpose of this distribution and separation of powers is to ensure that each department observes the applicable constitutional limitations and restrictions upon its authority:

"The union of all the powers of government in the same hands is but the

definition of a despotism. To guard against such a government was one great object of the Constitution. This was to be done by *this distribution of powers.* This *is the great principle of American liberty. The rights, the property, and the liberties of the people, depend upon the due observance by each department of the constitutional limitations and restrictions upon its authority.*" *Id.* at 301 (emphases added).

Unlike state constitutions that date from the colonial era, nineteenth-century constitutions like Rhode Island's were "drafted by people who [had] experienced the governmental irresponsibility and corruption resulting from initial experiments with untrammeled legislative authority." John Devlin, *Toward a State Constitutional Analysis of Allocation of Powers: Legislators and Legislative Appointees Performing Administrative Functions*, 66 Temp. L.Rev. 1205, 1224–25 (1993). By expressly providing for the distribution and vesting of all state-government powers among the three departments of state government, our first state constitution, like its immediate precursors (the so-called People's and Freeholder's Constitutions), "diminished the power of the legislature by providing for a clear separation of powers according to the three branch principle." Patrick T. Conley, *Democracy in Decline: Rhode Island's Constitutional Development 1776–1841*, 312–13 (1977) (discussing the People's Constitution). This indisputable feature of our constitution (namely, its radical diminution of the plenary powers previously exercised by the Legislature before the state adopted its constitution in 1842 via the constitution's distribution of the executive and judicial powers to the non-legislative departments of state government) not only has remained constant throughout its history, but also has been strengthened markedly over time by various amendments and reenactments that have en-

---

**33.** Article 5, "Of the Distribution of Powers," provides:

"The powers of the government shall be distributed into three departments: the legislative, executive and judicial."

hanced the independence and express powers of the executive and judicial departments.

Article 9 of the present constitution likewise contains provisions that operate to limit the power of the General Assembly. In particular, article 9, section 1, vests the chief-executive power in the Governor, while section 2 of this same article charges him or her with the faithful execution of the laws.[34] As in the United States Constitution, this vesting of the chief-executive power "was given in general terms, strengthened by specific terms where emphasis was regarded as appropriate, and was limited by direct expressions where limitation was needed." *Myers v. United States*, 272 U.S. 52, 118, 47 S.Ct. 21, 26, 71 L.Ed. 160, 167 (1926). Most importantly, it constitutes both a substantive grant of law-execution power to the Governor as well as a denial and restriction upon the exercise of similar powers by the General Assembly. *See Creditors' Service Corp. v. Cummings*, 57 R.I. 291, 300, 190 A. 2, 8 (1937) ("The constitutional distribution of the powers of government is at once a grant of specific power to each department and a prohibition to the other two with reference to that same power.").[35] Although the constitution does not define the scope of the Governor's chief-executive power, such a vesting of power must be deemed to include, at a minimum, the right to superintend how the laws of this state will be executed, especially if the Governor's corresponding duty to take care that the laws of the state are faithfully executed is to have any meaning whatsoever. R.I. Const. art. 9, sec. 2. Moreover, because the constitution designates the Governor as the *chief*-executive officer, it implies that the Governor will be able to appoint, manage, and control *subordinate* executive officials and entities that will be available to assist him or her in executing the laws. *See, e.g., Legislative Research Commission v. Brown*, 664 S.W.2d 907, 922–23 (Ky.1984) (noting that the power to appoint officials performing executive functions is inherently executive in nature); *Opinion of the Justices*, 365 Mass. 639, 309 N.E.2d 476, 479 (1974) ("The creation of a public office is a legislative function, but the appointment of a particular person to an office is the function of the executive department.") (quoting *Commissioner of Administration v. Kelley*, 350 Mass. 501, 215 N.E.2d 653, 657 (1966)); *Alexander v. State*, 441 So.2d 1329, 1344–45 (Miss.1983) (holding that, because the power to appoint individuals to serve on administrative agencies that perform executive functions lies at the "core" of executive power, the Legislature may not appoint any of these individuals to serve on administrative agencies that perform executive functions).

---

34. Article 9, section 1, of our present constitution, "Power vested in governor," provides:
 "The chief executive power of this state shall be vested in a governor * * *"
 Article 9, section 2, "Faithful execution of laws," provides:
 "The governor shall take care that the laws be faithfully executed."

35. Note that the constitution's vesting of the Governor with a substantive chief-executive power is not based on any notion that certain authority or power is inherently executive. Rather, the clause in the constitution that vests the chief-executive power in the Governor actually grants to the Governor a certain substantive authority that he or she would lack in the absence of such an enabling provision: namely, the power to superintend how state laws are executed. Thus, whether or not the framers truly "refused to vest the executive department with full executive powers," *Gorham v. Robinson*, 57 R.I. 1, 23, 186 A. 832, 844 (1936), they certainly vested the Governor, at a minimum, with the power to oversee the execution and administration of the state's laws and the correlative duty to take care that these laws are faithfully executed. Such a minimalist construction of the Governor's constitutional powers also avoids converting the vesting-of-the-chief-executive power and the "take care" clauses into meaningless inkblots. For such would be the ineluctable result of limiting the Governor's authority to the enumerated but restricted executive powers that follow these clauses. *Accord* Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to Execute the Laws*, 104 Yale L.J. 541, 579–82 (1994).

"It is inconceivable that the Constitution-makers would vest in the Governor the entire executive power, with the admonition that he take care that the laws are enforced, knowing that in enforcing them he must have the assistance of subordinates, whose loyalty he must be in a position to command, and then strip him of all appointive power * * * " *Tucker v. State*, 218 Ind. 614, 35 N.E.2d 270, 285 (1941).

Thus, as a practical matter, the Governor needs help (in the form of subordinate executive entities, officers, and administrators) in taking care to execute the laws of this state faithfully, as the constitution requires, because the Governor cannot do so effectively without such assistance. Moreover, the Governor cannot possibly function as the state's chief-executive officer if he or she has no role, no say, and no control whatsoever with respect to the execution of state laws. For these reasons, the constitution's vesting of the chief-executive power in the Governor and its imposition of a correlative duty to execute the laws faithfully necessarily implies a power on the Governor's part to appoint these subordinate executive officers and administrators in furtherance of his or her law-executing responsibilities. "It was generally understood that the grant of executive power carried with it, among other things, the general power of appointment, and so it was unnecessary to define the grant by setting out in detail that it should carry with it the power of appointment, together with details of the other powers generally understood to be included." *Tucker*, 35 N.E.2d at 283; *see also Zemprelli v. Thornburg*, 47 Pa.Cmwlth. 43, 407 A.2d 102, 105 (1979) ("[T]he power of appointment is intrinsically an executive function."). Thus:

"It is generally recognized that the power to appoint Executive Officers is *inherently* executive, and that to hold otherwise is to deprive the Chief Executive of the right to control his own branch of government. The Governor's obligation to faithfully execute the law *implies*, as a necessary incident, the power to appoint those who will act under his direction in discharging this obligation." Sheryl G. Snyder & Robert M. Ireland, *The Separation of Governmental Powers Under the Constitution of Kentucky: A Legal and Historical Analysis of L.R.C. v. Brown*, 73 Ky. L.J. 165, 210–11 (1984–85) (emphases added).

Indeed, such a power is essential to the Governor's ability to perform the chief-executive function that the constitution vests in that office. Without such a power, the Governor would be totally dependent upon the Legislature for his or her ability to execute the laws, and if it chose to do so, the Legislature could surround the Governor with subordinates chosen by others, loyal to others, and removable by others. Like an Indian chief with no Indians, the Governor would be reduced to a mere ceremonial figure, a chief executive at sufferance of the Legislature, and a Governor in name only. So conceived, he or she would be the functional equivalent of a show captain, propped up on the ship of the state's maindeck in full-dress regalia for all the passengers to ogle, while the real legislative bosses steered the ship, barked orders, and hired, fired, and supervised the crew and all those who toiled away in the boiler rooms below. Then–Superior Court Justice Ronald Lagueux (now Chief Judge for the United States District Court for the District of Rhode Island) reached this same conclusion in *Easton's Point Association, Inc. v. Coastal Resources Management Council*, C.A. No. 84–3737, at 13 (R.I.Super.Apr. 21, 1986), *rev'd on other grounds*, 522 A.2d 199 (R.I. 1987), when he stated:

"If the legislature, by right, can control all appointments to the executive branch, save the governor, then in essence the governor is nothing more than a ceremonial head of state. The framers of the 1842 Constitution must be deemed to have intended the governor to be more than a figurehead. Other-

wise they would not have distributed power three ways in Article III and given the governor the entire executive power. To read the Constitution as creating a ceremonial governor renders the words in Article VII Secs. I and 2, as well as Article III itself empty, void of substantive force and contrary to the plain meaning of those clauses."

To avoid converting this state's chief executive into such a dumb show of authority, individuals and entities within the executive department working with and under the control of the Governor are essential if the specific laws enacted by the Legislature are to be carried out and implemented as the constitution directs. If the Governor had little or no practical role in executing particular laws because he or she could not control the boards, commissions, agencies, and authorities that are charged with certain law-executing functions, then the Governor would be unable to "take care" that these laws are faithfully executed, and the executive department would fall far short of functioning as one of the "co-equal" branches of government established in the constitution. *See Holmes v. Farmer,* 475 A.2d 976, 985 (R.I.1984) (holding that Rhode Island's Speech in Debate Clause "protects the institution of the Legislature itself from attack by either of the other *co-equal* branches of government") (emphasis added). Accordingly, by necessary implication, when the constitution vests the Governor with the chief-executive power and charges him or her with the duty to take care that the laws are faithfully executed, such language should be interpreted as providing the Governor with the power to control the manner in which these laws are executed—unless the constitution expressly provides that some other official is to be charged with carrying out certain specified executive functions.[36] As a result, "the legislature cannot constitutionally create a special instrumentality of government to

implement specific legislation and then retain some control over the process of implementation by appointing legislators to the governing body of the instrumentality." *State ex rel. Wallace v. Bone,* 304 N.C. 591, 286 S.E.2d 79, 88 (1982); *accord Greer v. State,* 233 Ga. 667, 212 S.E.2d 836 (1975); *Stockman v. Leddy,* 55 Colo. 24, 129 P. 220 (1912).

The opponents of Regulation 5014 argue that the members of this Court should construe the constitution's vesting of the "chief" executive power with the Governor as expressly limiting the Governor's executive powers, thereby implicitly conferring upon the General Assembly the authority to exercise subordinate executive powers. But, by distributing the executive powers of government to the executive department and by vesting the chief-executive power in the Governor and the other executive powers in the other named executive officers, the constitution does not purport to distribute any residuum of executive power to the General Assembly. Indeed, such a combination or blending of executive and legislative powers in the General Assembly was an anathema to the framers of our constitution because it would have violated the whole purpose of separating and distributing these powers in the first place.

> "It was the celebrated maxim of Montesquieu, that 'there can be no liberty where the legislative and executive powers are united in the same person or body of magistrates;' * * *. [T]he reason, tersely given, is, 'because apprehensions may arise lest *the same* monarch or senate should *enact* tyrannical laws, to *execute* them in a tyrannical manner' * * *." *G. & D. Taylor & Co.,* 4 R.I. at 341 (quoting Montesquieu).

Rather, the constitution distributes *all* of the state government's executive power to the executive department and vests *all* of the state's chief-executive power in the

---

**36.** For example, because the constitution provides for an elected attorney general, this executive official would be the officer constitutionally responsible for prosecuting violations of the laws.

Governor, except to the extent that it specifically provides elsewhere for limited exceptions to this general distribution and vesting of the executive power.[37]

> "Such a separation of the powers of government, between its different departments, had, when our constitution was adopted in 1843, and long previous, its well-known history, and its long and firmly established meaning and purpose; and he who shuts his eyes to these, in construing the comprehensive and apothegmatic clauses of such an instrument, shuts his eyes to the only light which is strong and diffused enough to enable him to perceive their just interpretation." *Id.* at 347–48.

Thus, the constitution distributes the remaining non-chief-executive powers to the other executive-department officials· while it distributes the legislative and judicial powers of government to the General Assembly and the Judiciary, respectively. This distribution of governmental power among the three departments of government indicates that the powers distributed to one department cannot be exercised at all by another department. *See Narragansett Indian Tribe v. State*, 667 A.2d 280, 282 (R.I.1995) ("[P]ower exclusively conferred upon one department is, by necessary implication, denied to the other.") (quoting *In re Judgment Against Dorr*, 3 R.I. at 301); *Morrison v. Lamarre*, 75 R.I. 176, 185, 65 A.2d 217, 222 (1949) ("In the exercise [by the legislative, executive, and judicial departments of the powers vested in them by the constitution each branch of the government is supreme in its respective field, which neither of the other two branches may invade."]; *Creditors' Service Corp.*, 57 R.I. at 300, 190 A. at 8 ("The constitutional distribution of the powers of the government is at once a grant of specific power to each department and a prohibition to the other two with reference to that same power."); *G. & D. Taylor & Co.*, 4 R.I. at 359 (noting that the constitution's grant of authority to one branch of government implicitly precludes the exercise of that same power by another branch).

Notwithstanding this long line of Rhode Island precedents indicating that, at least in this state, the constitution's separation of powers is to be strictly construed, members of this Court more recently have looked to the more liberal and flexible test supplied by federal jurisprudence to resolve separation-of-powers questions. *See In re Advisory From the Governor*, 633 A.2d at 674–75 (citing *Chadha v. Immigration and Naturalization Service*, 634 F.2d 408 (9th Cir.1980), *aff'd*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (defining a constitutional violation of the separation-of-powers doctrine)). In his concurring opinion in *Chadha*, Justice Powell, in analyzing a separation-of-powers challenge to a statute providing for a legislative veto of administrative action, concluded: "Functionally, the [separation-of-powers] doctrine may be violated in two ways. One branch may interfere impermissibly with the other's performance of its constitutionally assigned function. * * * Alternatively, the doctrine may be violated when one branch assumes a function that more properly is entrusted to another." *I.N.S. v. Chadha*, 462 U.S. 919, 963, 103 S.Ct. 2764, 2790, 77 L.Ed.2d 317, 352 (1983) (Powell, J., concurring). Moreover, in *State v. Jacques*, 554 A.2d 193, 196 (R.I.1989), this Court itself looked to federal separation-of-powers jurisprudence to define what

---

**37.** Thus, all of the enumerated executive powers set forth in the constitution serve to limit and restrict what is otherwise a plenary distribution of this state government's executive power to the executive department and a plenary vesting of chief-executive power in the Governor. Significantly, unlike the federal Constitution's vesting of legislative powers in the Congress, our constitution contains no "herein granted" language or its equivalent that would convert a plenary distribution and vesting of state executive power into one that was limited and restricted to the enumerated powers expressly described in the constitution, but to no others that otherwise would qualify as state government's executive powers.

constitutes a separation-of-powers violation:

> "[T]he twin purposes of preventing concentrations of power dangerous to liberty and of promoting governmental efficiency are served if we define a constitutional violation of the separation of powers as *an assumption by one branch of powers that are central or essential to the operation of a coordinate branch, provided also that the assumption disrupts [throws into confusion or disorder, see In re Advisory From the Governor, 633 A.2d at 675] the coordinate branch in the performance of its duties and is unnecessary to implement a legitimate policy of the Government."* *Id.* (quoting *Chadha,* 634 F.2d at 425) (emphasis added).

*See also Sundlun,* 662 A.2d at 58 (citing *Chadha* with respect to this Court's proper analysis of a separation-of-powers challenge).

Applying the same separation-of-powers analysis as this Court has used previously to the questions presently before us yields the following result: the General Assembly cannot appoint its own sitting members or its own designees to executive entities because, by doing so, the Legislature, or its members, thereby would be in a position to exercise undue influence, if not control, over the execution and carrying out of the laws that it passes. Such a power of appointment is essential to the effective operation of the executive department and is far afield from the core law-making function of the legislative department. Indeed, ever since *G. & D. Taylor & Co.,* this has been a constitutional no-no:

*"If the law-making department in our government, has also the power to interpret and to enforce their interpretation of the laws,* either acting wholly by itself, or *by directing and controlling,* as a superior tribunal, all other tribunals of the state, every friend to a settled and well-ordered administration of justice amongst us—every lover of free government itself—has, indeed, cause to mourn." 4 R.I. at 341 (emphasis added).

As the United States Supreme Court has noted: "Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint the agents charged with the duty of such enforcement. The latter are executive functions." *Springer v. Government of the Philippine Islands,* 277 U.S. 189, 202, 48 S.Ct. 480, 482, 72 L.Ed. 845, 849 (1928); *see also Buckley v. Valeo,* 424 U.S. 1, 139, 96 S.Ct. 612, 692, 46 L.Ed.2d 659, 756 (1976); *Myers v. United States,* 272 U.S. 52, 128, 47 S.Ct. 21, 29, 71 L.Ed. 160, 171 (1926) (quoting James Madison) ("The Legislature creates the office, defines the powers, limits its duration and annexes a compensation. This done, the Legislative power ceases. They ought to have nothing to do with designating the [person] to fill the office.").[38] Such power in the hands of the Legislature could disrupt and interfere with the Governor's performance of his or her constitutionally assigned duty to "take care" that the laws of this state are "faithfully executed," and could result in the General Assembly or its designees performing a function that the constitution "more properly" entrusts to the Governor and to the executive department.[39] For this reason, "[t]he weight of

---

**38.** In contrast, the constitution grants to the General Assembly the power to enact the laws of this state. See article 6, section 2, of the constitution, entitled "Power vested in general assembly," which provides:

> "The legislative power, under this Constitution, shall be vested in two houses, the one to be called the senate, the other the house of representatives; and both together the general assembly. The concurrence of the

two houses shall be necessary to the enactment of laws."

**39.** It also would subvert the bicameralism and presentment requirements that must be satisfied before the Legislature can enact any valid laws: if the General Assembly could control administrative agencies by staffing them with legislators or their designees, then laws in the form of agency regulations could be promulgated and administered without any gubernatorial involvement whatsoever, let

authority * * * both under federal and other states' separation of powers doctrines, is that legislators and legislative appointees may not serve on executive or administrative boards and commissions." Robert F. Williams, *Rhode Island's Distribution of Powers Question of the Century: Reverse Delegation and Implied Limits on Legislative Powers,* 4 Roger Williams U.L.Rev. 159, 170 (1998); *see also State ex rel. Wallace,* 286 S.E.2d at 84 (listing a myriad of state-court decisions that, adhering to the separation-of-powers principle, "do not tolerate legislative encroachment or control over the function and power of the executive branch"). *See generally* Sheldon Whitehouse, *Appointments by the Legislature Under the Rhode Island Separation of Powers Doctrine: The Hazards of the Road Less Traveled,* 1 Roger Williams U.L.Rev. 1 (1996) (reviewing extensive state and federal authorities barring legislative appointments to executive agencies on separation-of-powers grounds).

A general legislative power to appoint individuals to any given executive entity also could tend to compromise and check the Governor's ability to perform the necessary responsibilities of that office with respect to carrying out the laws applicable to the specific entity in question. In the words of the United States Supreme Court, "[t]o permit the execution of the laws to be vested in an officer answerable only to [the Legislature] would, in practical terms, reserve in [the Legislature] control over the execution of the laws." *Bowsher v. Synar,* 478 U.S. 714, 726, 106 S.Ct. 3181, 3188, 92 L.Ed.2d 583, 596 (1986). Thus, the general rule is that, "while [the Legislature] may create an office, it cannot appoint the officer." *Shoemaker v. United*

*States,* 147 U.S. 282, 300, 13 S.Ct. 361, 391, 37 L.Ed. 170, 185 (1893). Even the legislative appointment of nonvoting, ex-officio members of executive entities is problematic from a separation-of-powers standpoint:

"[W]e cannot conceive why [the Legislature] would wish or expect its officials to serve as *ex officio* members if not to exercise *some* influence. Even if the *ex officio* members were to remain completely silent during all deliberations (a rather unlikely scenario), their mere presence as agents of [the Legislature] conveys a tacit message to the other commissioners. The message may well be an entirely appropriate one—but it nevertheless has the potential to influence the other commissioners." *Federal Election Commission v. NRA Political Victory Fund,* 6 F.3d 821, 826 (D.C.Cir. 1993).

In other words, by vesting the Governor with the chief-executive power and by charging him or her to take care that the laws of this state are faithfully executed, the constitution necessarily implies that the Governor has the right and the power to appoint subordinate executive officers and administrators to executive entities so that the Governor can fulfill his or her responsibilities as the state's chief-executive officer. James Madison expressed a similar view: "I conceive that if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." 1 Annals of Cong. 463 (Joseph Gales ed. 1789).[40] Therefore, by conferring the chief-executive power upon the Governor and by distributing all of the executive

---

alone without any need to overcome the possibility of a gubernatorial veto that otherwise would apply to all legislation enacted directly by the General Assembly. Thus, "an engine for avoidance of the veto in the formulation of statutory policy [would be] created." Peter L. Strauss, *The Place of Agencies in Government: Separation of Powers and the Fourth Branch,* 84 Colum. L.Rev. 573, 651 (1984).

40. " 'The power of the Legislature to appoint any other than their own officers,' " said Madison, " 'departs too far from the theory which requires a separation of the great Departments of Government.' " Wood, at 452 & n. 33 (quoting from 6 *The Papers of Thomas Jefferson,* ch. IV, Madison's Observations, at 311 (Julian P. Boyd ed. Princeton University Press 1952)).

power to the executive department, the constitution necessarily denies to legislators and to the legislative department any authority to "interfere impermissibly with the other's performance of its constitutionally assigned function," *Chadha*, 462 U.S. at 963, 103 S.Ct. at 2790, 77 L.Ed.2d at 352; namely, in the case of the Governor, to act as the state's chief-executive officer and to execute faithfully the laws as enacted by the General Assembly. Moreover, the members of this Court previously have acknowledged that while the General Assembly has the authority to create administrative agencies, it is the Governor who holds the authority to appoint executive officials. *See In re Advisory Opinion to the Governor*, 612 A.2d at 17 ("This jurisdiction has consistently recognized the authority of the General Assembly to create administrative agencies and the authority of the Governor to appoint agency officials."). Thus, while the General Assembly has the power to establish administrative agencies to carry out the laws that it passes, it possesses no constitutional authority to appoint its own members or other individuals to executive entities and other positions within the executive branch.

Those who argue in favor of a legislative power of appointment to executive positions assert that the Legislature's historical powers have been plenary and unlimited, except as they have been expressly or impliedly restricted by the United States and Rhode Island Constitutions. They further argue that, pursuant to article 6, section 10, of the constitution, the General Assembly retains all of the powers which it has exercised previously, unless they are prohibited by other constitutional provisions.[41] Hence, they contend, because the General Assembly throughout its history has periodically exercised the power to appoint persons to executive entities—even after the constitution's 1842 adoption—such power does not lie with the Governor; rather, it always has belonged to the General Assembly under our constitution, and therefore, it continues to hold this power today. Because the Governor's official executive powers as enumerated in the constitution are still quite limited,[42]

**41.** Article 6, section 10, "Continuation of previous powers," provides:

"The general assembly shall continue to exercise the powers it has heretofore exercised, unless prohibited in this Constitution."

**42.** Indeed, Chief Justice Ames, in the 1856 *G. & D. Taylor & Co.* decision, went so far as to claim that "[the Governor's] *official power*, under our constitution, amounts to nothing." 4 R.I. at 343. Doubtless, Chief Justice Ames had in mind that the gubernatorial magistrate created by the constitution was "a very pale reflection indeed of his regal ancestor," Wood, at 136, because such chief executives in democratic America had been " 'stripped of most of those badges of domination, called prerogatives,' " that were characteristic of monarchical regimes like the one in Great Britain, *id.* at 137 (quoting John Adams). But, in selecting the adjective "official" to modify his comments regarding the chief executive's constitutional power, Chief Justice Ames implicitly recognized that the constitution still vested the Governor with *unofficial* and undefined chief-executive power; that is, it endowed the state's highest elected office holder with those unenumerated but essential powers that must be contained within the vesting of the state's chief-executive power if that clause is not to be reduced to a meaningless inkblot. These include appointment powers that the state government's chief-executive officer must possess if he or she is to function effectively in that capacity and if he or she is to take care that the state's laws are executed faithfully. Moreover, Chief Justice Ames was writing at a time (1856) which was only thirteen years removed from the executive department's constitutional emancipation in 1843 from almost two centuries of complete political subordination and bondage to Rhode Island's legislative power. Thus, just as the adoption of the Civil War Amendments to the federal Constitution did not result immediately in equal status under the law for African Americans, the constitution's mere demarcation on paper of a separate executive department headed by a magistrate vested with the state's chief-executive power did not result immediately in a separate-but-equal status for Rhode Island's executive department vis-á-vis the legislative department. Therefore, the Governor's official power in 1856 may as yet have amounted to nothing, especially when contrasted to the pre-constitutional powers of the General Assembly and to the pre-revolutionary royal prerogatives exercised by the

because the General Assembly has had a long history of participating in the creation and filling of various state-government offices, and because article 6, section 10, of the constitution reaffirms the General Assembly's "heretofore exercised" powers, except as otherwise prohibited by the constitution, the proponents of this position argue that the constitution does not prohibit legislators from participating in executive-department appointments.

But the "short and true reply," *G. & D. Taylor & Co.*, 4 R.I. at 361, to this argument is the same one that Chief Justice Ames gave in 1856, when it was argued to this Court in *Taylor* that the Legislature should be allowed to continue exercising its judicial powers, just as it had both before and after the enactment of the 1842 constitution. Specifically, the General Assembly's and individual legislators' exercise of executive powers:

> "*is* prohibited to them by the constitution; and that we must be false to history, right reason, the settled rules of judicial exposition, the established meaning of the language of the constitution as given unvaryingly by the highest authority, and with that meaning adopted by the people in adopting the constitution, and so false both to the people and the

constitution, if we come to any other conclusion." *Id.*

By distributing the executive power to the executive department, by vesting the Governor with the chief-executive power, and by charging him or her with the duty to take care that the laws of this state are faithfully executed, the constitution *does* prohibit the General Assembly from continuing to exercise executive powers. Indeed, as Chief Justice Ames reminds us, "[t]he constitution was set up * * * to rescue, through the aid of the judicial department, the powers of that *and the other department of the government* [the executive department] from the eddying current of [the General Assembly's] 'impetuous vortex.'" 4 R.I. at 355 (emphasis added). If all of the Governor's chief-executive powers—not just the few official ones spelled out in the constitution—truly "amount[ ] to nothing" or "very little" under our constitution, then what would have been the purpose or need for such an elaborate constitutional rescue operation to save such negligible and nugatory powers from the legislative maelstrom? [43] By formulating a constitution that would separate the powers of state government and thereby end the "elective despotism" of two centuries of legislative hegemony in Rhode Island,[44] the framers understood

---

English King and his colonial magistrates. Nonetheless, the seeds of a separate-but-equal executive department had been sown in the constitution and were already beginning to germinate when the Court rendered its decision in *Taylor*.

**43.** Thus, even if Chief Justice Ames' obiter dictum in *G. & D. Taylor & Co.* was correct—that is, that "[the Governor's] official power, under our constitution, amounts to nothing," 4 R.I. at 343—the entire *Taylor* Court understood that the Governor's as-yet inchoate chief-executive power had to be protected against legislative encroachment because the constitution was established "to rescue * * * [the executive-department powers] from the eddying current of [the General Assembly's] 'impetuous vortex,'" *id.* at 355. Although the Court observed that "[t]he executive power had been nominal, merely, under the charter; and the constitution extends it very little," 4 R.I. at 349–50, that "very little" still had to be

saved through the aid of the judicial department if the executive power was to be rescued from the strong legislative riptide that threatened to suck all other government powers into its "impetuous vortex," notwithstanding their separate constitutional beachheads. *Id.* at 355. Thus, the *Taylor* Court clearly recognized that only by judicially prohibiting the General Assembly from continuing to practice its "heretofore exercised" judicial and executive powers could these fledgling departments survive the centripetal pull of the Legislature's power-draining whirlpool, thereby enabling these departments, in time, to swim against this strong legislative undertow, and so to fulfill their independent and separate constitutional functions.

**44.** It was no comfort to Rhode Island's constitutional advocates that these concentrated state-government powers were being exercised under the charter by a General Assembly composed of many elected individuals

that they were thereby joining Rhode Island to the post-revolutionary views of those other states that also had concluded that the "[a]ppointment of military and magisterial officials must be taken away from the legislature and put back in the hands of the governors in the name of separation of powers." Wood, at 452. *See In re Judgment Against Dorr*, 3 R.I. at 304–05, which provides that:

"The section [allowing the General Assembly to 'continue to exercise the powers they have heretofore exercised, unless prohibited in this Constitution'] is found in that part of the Constitution which treats of the legislative power, and confers it on the General Assembly. *When, therefore, it speaks of conferring power on that body, the fair presumption is, that it intends legislative power, unless a different intent is expressed.*

" \* \* \*

"We think, too, it would be unreasonable to suppose the Constitution intended by this section to unite in one body legislative and judicial [or executive] power, after having in the previous provisions vested these powers in different bodies; more especially when we recollect that the distribution of these powers is declared by the Constitution to be its fundamental principle, and all admit such distribution is indispensable to

freedom; whereas *the union of the two powers in the same body is dangerous, if not fatal to it.*" (Emphases added.)

Although the *Dorr* Court interpreted this residual legislative-powers section of the constitution as it related to a dispute between the legislative and judicial departments, the inescapable thrust of its reasoning is to prohibit the Legislature not only from exercising judicial power, but also from exercising executive power and vice versa. *See Legislative Research Commission* 664 S.W.2d at 913 (stating that while the Legislature may be the repository of all state powers not vested elsewhere, this does not allow it to vest executive functions in legislators; the residual power includes only those powers that are legislative in nature). In addition, the mere fact that the Legislature may have participated to a greater or lesser extent in certain executive-department appointments at various times in the past does not mean that they always have done so in accordance with the constitution. *See, e.g., Chadha,* 462 U.S. at 944–59, 103 S.Ct. at 2780–88, 77 L.Ed.2d at 340–50 (holding that a federal legislative-veto provision was unconstitutional notwithstanding the long-standing history of this practice). The mere repetition of a constitutional wrong—no matter how frequent—cannot ripen into a lawful constitutional amendment.[45] "Historical anecdotal occurrences [concerning the

---

rather than by one unelected monarch. After all, as Thomas Jefferson observed in reference to Virginia's colonial legislature, "173 despots would surely be as oppressive as one" because "[a]n *elective despotism* was not the government we fought for." Thomas Jefferson, *Notes on the State of Virginia, in Thomas Jefferson: Writings* 245 (Library of America ed.1984).

**45.** In fact, at the 1986 constitutional convention, delegates considered and rejected a provision that would have provided an express enlargement of the Legislature's appointment powers. The text of this rejected proposal contained a provision that would have been unnecessary if the General Assembly already possessed this power vis-á-vis executive-department entities. The provision read as follows:

"The governor shall appoint, with the advice and consent of the senate, the heads of all administrative departments as the same may from time to time be established by law, excepting those headed by a general officer. Persons so appointed shall serve at the governor's pleasure unless appointed for a term certain as provided by law. *The method of nomination, appointment, and removal of the members of boards, of commissions, and of governing bodies of state instrumentalities and authorities shall be prescribed by statute.*" Const. Conv. Res. 86–172 (substitute A) (as amended), 1986 Const. Conv. (Rhode Island 1986); *see also* 1 *Journal of the 1986 Constitutional Convention*, No. 13, June 26, 1986, at 5 (recording the convention vote in which Resolution 86–172 (substitute A) (as amended) failed).

General Assembly's past powers and practices] cannot overcome a clear and unambiguous grant of constitutional power" to another constitutional actor or department of government. *In re Advisory Opinion to the Governor*, 688 A.2d at 291.

"Acquiescence for no length of time can legalize a clear usurpation of power, where the people have plainly expressed their will in the Constitution, and appointed judicial tribunals to enforce it. A power is frequently yielded to merely because it is claimed, and it may be exercised for a long period, in violation of the constitutional prohibition, without the mischief which the Constitution was designed to guard against appearing, or without any one being sufficiently interested in the subject to raise the question; but these circumstances cannot be allowed to sanction a clear infraction of the Constitution." 1 Thomas M. Cooley, *A Treatise on the Constitutional Limitations*, 150–51 (Little, Brown, and Co. 8th ed.1927).

Although it is true that, under the constitution, "no power of appointment is [expressly] vested in the governor, save to fill vacancies temporarily existing," *see In re Advisory From the Governor*, 633 A.2d at 666 (quoting *Election of Officers by the Senate*, 28 R.I. 607, 616, 69 A. 555, 559 (1908)); R.I. Const. art. 9, sec. 5; [46] art. 4, sec. 4,[47] I believe, for the reasons previously stated, that by vesting the Governor with the state's chief-executive power, by charging the Governor with the duty to take care that the laws are executed faithfully, and by prohibiting the General Assembly from executing the laws it enacts, the constitution necessarily empowers the Governor to appoint subordinate executive officers and administrators as may be needed for the Governor to fulfill these responsibilities as they pertain to executive entities. The power to appoint and remove the governing members of such executive entities is, as a practical matter, the power to control how the laws are executed. *See Bowsher*, 478 U.S. at 726, 106 S.Ct. at 3188, 92 L.Ed.2d at 596. The constitution distributes this executive power exclusively to the executive department, and ultimately, it vests the Governor with both the responsibility and the chief-executive power to accomplish this task. Thus, although the General Assembly has the authority to create administrative agencies and may even have the power, in certain circumstances, to appoint various individuals to legislative and advisory boards and to other non-executive government positions, it has no constitutional authority to interfere with or to interdict executive functions by appointing the individuals who serve on executive entities, let alone by appointing themselves to such positions.

Otherwise, as a practical matter, the Legislature and its designees not only would have the ability to influence the decisions of these executive entities, but they also would be in a position to execute the very laws that the General Assembly has enacted. *See, e.g., State ex rel. Woods*

---

**46.** Article 9, section 5, of the constitution, "Authority to fill vacancies," provides:

"The governor may fill vacancies in office not otherwise provided for by this Constitution or by law, until the same shall be filled by the general assembly, or by the people."
Article 9, section 5, only applies to vacancies occurring in offices to which the incumbents are elected by the people, or by the General Assembly, and does not apply to other offices, including those subject to the Governor's chief-executive power. *See In the Matter of the Filling of Vacancies by the Governor (Railroad Commissioner)*, 28 R.I. 602, 606, 67 A. 802, 803–04 (1907).

**47.** Article 4, section 4, of our constitution, "Temporary appointment to fill vacancies in office of secretary of state, attorney-general, or general treasurer," provides:

"In case of a vacancy in the office of the secretary of state, attorney-general, or general treasurer from any cause, the general assembly in grand committee shall elect some person to fill the same; provided, that if such vacancy occurs when the general assembly is not in session the governor shall appoint some person to fill such vacancy until a successor elected by the general assembly is qualified to act."

*v. Block*, 189 Ariz. 269, 942 P.2d 428 (1997) (finding a separation-of-powers violation when a legislative body performs an executive function yet is controlled by members appointed by the Legislature). Such a regime would countenance the legislative branch's exercise of government powers that are central and essential to the executive branch, and it would condone an arrogation of power that would disrupt the executive department in the performance of its separate constitutional duties. Such legislative overreaching, of course, is completely unnecessary to implement any legitimate policy of state government, *see Jacques*, 554 A.2d at 195–96, especially because the distribution of powers among the departments of state government "is the great principle of American liberty." *In re Judgment Against Dorr*, 3 R.I. at 301. As the United States Supreme Court recently stated:

> "One might argue that the provision for a Board [containing legislative appointments] is the kind of practical accommodation between the Legislature and the Executive that should be permitted in a 'workable government.' Admittedly, Congress imposed its will * * * by means that are unique and that might prove to be innocuous. However, the statutory scheme challenged today provides a blueprint for extensive expansion of the legislative power beyond its constitutionally confined role. * * * Congress could, if this Board [containing legislative appointments] were valid, use similar expedients to enable its Members or its agents to retain control, outside the ordinary legislative process, of the activities [of those] charged with executing virtually every aspect of national policy. As James Madison presciently observed, the legislature 'can with greater facility, mask under complicated and indirect measures, the encroachments which it makes on the co-ordinate departments.' The Federalist No. 48, at 334." *Metropolitan Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 276–77, 111 S.Ct. 2298, 2312, 115 L.Ed.2d 236, 259 (1991).

In sum, I am of the opinion that interpreting the constitution to allow the General Assembly or any one or more of its elected members to participate generally and without reservation in appointments to any and all executive entities would constitute a usurpation of the Governor's chief-executive power by the legislative branch in violation of the constitution's distribution and separation of powers. Sanctioning such a practice by legislators or by the legislative department effectively would disrupt the Governor in the exercise of his chief-executive powers, disable him from fulfilling his constitutional duty to take care that the laws of the state are faithfully executed, and expand the General Assembly's powers beyond the functional boundaries imposed by the constitution. Put simply, the Legislature and its members have no constitutional authority whatsoever to execute the laws that they pass. Accordingly, any legislation that provides for legislators or their appointees to serve on executive entities must be scrutinized closely in light of this fundamental limitation on the Legislature's power. Such scrutiny should proceed not only with a view towards maintaining the functional integrity mandated by the constitution's separation-of-powers principle, but also with an eye towards practical criteria such as those used by the Kansas Supreme Court to evaluate the legality of particular statutory and administrative schemes providing for such legislative appointments:

> "First is the essential nature of the power being exercised. Is the power exclusively executive or legislative or is it a blend of the two? A second factor is the degree of control by the legislative department in the exercise of power. Is there a coercive influence or a mere cooperative venture? A third consideration of importance is the nature of the objective sought to be attained by the legislature. Is the intent of the legislature to cooperate with the executive by

furnishing some special expertise of one or more of its members or is the objective of the legislature obviously one of establishing its superiority over the executive department in an area essentially executive in nature? A fourth consideration could be the practical result of the blending of powers as shown by actual experience over a period of time where such evidence is available." *Parcell v. State*, 228 Kan. 794, 620 P.2d 834, 836 (1980) (quoting *State ex rel. Schneider v. Bennett*, 219 Kan. 285, 547 P.2d 786, 792 (1976)).

For these reasons, I answer the Governor's second certified question by responding that, while the textual differences in the state and federal Constitutions must be addressed, acknowledged, and accounted for in resolving any separation-of-powers questions, and while these textual differences may mean that, in particular cases, the separation-of-powers principle at the state level need not be interpreted in exactly the same fashion as federal courts have interpreted it under the United States Constitution, on the whole, the same separation-of-powers principle is indeed applicable both to federal and state questions involving legislative appointments to executive entities. With respect to question number three, I also answer this question in the affirmative, except that, but for the ethics amendment to the constitution and the commission's adoption of Regulation 5014 pursuant to this amendment, I do not believe that the constitution necessarily prohibits the mere appointment of one or more sitting legislators (or their designees) to each and every public board or body regardless of their executive function and irrespective of whether the challenged arrangement constitutes "a significant interference by one department with the operations of another department." *Parcell*, 620 P.2d at 836 (quoting *State ex rel. Schneider*, 547 P.2d at 792). A further, more particularized response must await specific cases and controversies.

### Conclusion

It is important to remember that the advisory opinions given by the Justices of this Court in response to the Governor's questions are just that: advisory. No one opinion or collection of opinions represents or constitutes an opinion of the Rhode Island Supreme Court. *See Opinion to the Governor*, 96 R.I. 358, 364, 191 A.2d 611, 614 (1963). Indeed, the Court itself has not spoken on these questions, only its individual Justices. *See id.* Thus, there is no majority opinion of the Court, and no dissent therefrom. Most importantly, there is no binding legal precedent created by anything that has been said here today, and there is no decision of the Court that this Court or any other court must follow in later cases raising the same or similar legal issues. *See Opinion to the House of Representatives*, 88 R.I. 396, 400, 149 A.2d 343, 345 (1959). For these reasons, neither the proponents nor the opponents of Regulation 5014 are bound by what the Justices of this Court have said today. Indeed, however unlikely such a prospect may seem, even the Justices of this Court are at liberty to change their minds, to follow a different path in later cases or controversies, and to become better educated about what they themselves have said about the subjects addressed in these opinions when future matters arise concerning these same legal issues. For such is the peculiar nature of and the curious limitations placed upon the advisory opinions that we render as Justices of this Court: their legs and limbs—not to mention their teeth—are only as long and as strong as the reasoning that props them up. "[T]hat away, [they] are but gilded loam or painted clay." William Shakespeare, *King Richard the Second*, act 1, sc. 1.

"Our [legal] revels now are ended." Shakespeare, *The Tempest*, act 4, sc. 1. But the high political stakes wagered on the answers to the questions posed to us remain on the table, as yet unclaimed, and indeed, and yet as unclaimable. In the

end, the people of Rhode Island ultimately will decide how best to divide the power pot that lies at the center of our state government. Shall it be and remain a separate but equal division among the three departments of our government? Or shall one of them be allowed to grab and keep the lion's share? Shall the powers of our state government be checked and balanced? Or shall they be unchecked and imbalanced, with one player holding almost all of the aces and wild cards? These questions still need to be answered more definitively than they have been today and more clearly then they have been even in our constitution. Indeed, one hopes that our advisory opinions are just the opening salvos in the greater and the potentially more dispositive crossfire that will now ensue. Let the people be heard. *Vox populi, vox Dei* (The voice of the people is the voice of God).

/s/ Robert G. Flanders, Jr.

Associate Justice ROBERT G. FLANDERS, JR.